BYRNES, Judge.
Paul E. Butler and Thomas L. Butler were indicted for the “first degree murder of Mary Antoine while attempting to kill or inflict great bodily harm upon more than one person.” La.R.S. 14:30. The jury returned a sentence of life imprisonment for Thomas L. Butler and were deadlocked as to the sentence for Paul E. Butler. The court imposed a sentence of life imprisonment for Paul E. Butler. These defendants appeal their convictions and sentences relying upon two assignments of error. We modify the convictions and as modified the convictions and sentences are affirmed.
The record reflects the following evidence concerning this crime: Officer Edmond Worthy testified that on April 30, 1985 at 1:58 p.m., he responded to a call at 2119 Magnolia and discovered that Louise Kates and Mary Antoine had been severely *473 beaten. Both were bleeding profusely and the house was splattered with blood. Several people stood in the doorway. Worthy called for an emergency unit which transported the victims, and secured the scene. He discovered a broken knife in the kitchen sink with water running over it.
Officer Kevin Doucette went to the scene and collected blood samples. ■ He dusted for fingerprints, but was unable to lift any. He noticed the door appeared as if it had been pried open.
Detective Norman Pierce arrived on the scene and interviewed several potential witnesses: Norma Johnson (the neighbor from across the street) Elizabeth Kates, (daughter of one of the victims), Alvin Bernard, and Reverend Elizah Polk. Later, he prepared an arrest warrant for Paul Butler based on a photographic identification by victim, Louise Kates which was made while she was hospitalized. His investigation revealed that a Gold Seal Milk truck had been at the house, and as a result, he interviewed Thomas Butler, Donald Clark and several other truck drivers at the Gold Seal Creamery. He said he remembered including in his report that Louise Kates indicated (through nods while she was hospitalized) that the subject who stabbed her, once lived in Mary Antoine’s apartment. He said the door of the house looked as if it had been pried open, but that the break-in marks did not appear “fresh”. He said neither of the defendant’s fingerprints were found in the house.
Detective Norman McCord testified he conducted the photographic line-up in which Louise Kates identified Paul Butler. Kates was still hospitalized and had to communicate through nods, but she was conscious. He later conducted a photographic line-up containing a picture of Thomas Butler, and Kates identified him in the same way. McCord later took statements from Donald Clark and Thomas Butler.
Emma Sykes, nurse to Louise Kates, testified Kates was on antibiotics and steroids at the time she made the identification. She said valium and morphine had been authorized, but that Kates had not taken any that day.
Dr. Monroe Samuels, pathologist, testified he conducted the autopsy on Mary Antoine and she suffered twelve blunt injuries to the head and eleven skull fractures and that she died of those injuries. He said she had a cut on her hand consistent with an attempt to defend herself from a knife, and another cut on her head behind her ear. The head wounds were consistent with having been hit by a hammer, a pipe, or a crowbar. Her blood type was “0”.
Reverend Elizah Polk, 2702 Josephine Street in New Orleans, testified Paul Butler came to his house between 2:00 and 2:30 p.m. and washed his hands. Butler told him he had been jogging, but Polk had never seen him jog, although he had known him for ten to fifteen years. He said he saw Paul Butler at Mary Antoine’s on the Sunday before the crime. He said Antoine told him Paul Butler had rented one of her rooms for Thomas Butler. He said it was commonly known that Antoine kept money in her house.
Lloyd Smith, 2014 Magnolia Street in New Orleans, testified he saw Paul Butler at Polk’s house between 1:00 and 3:00 p.m. on the afternoon of the crime. He said Butler was shirtless and sweating and had his shirt covering his hands. Butler went into the bathroom. He reported he had been jogging, but Smith had never seen him jog, though he had known him for years.
Robert Seabrook said he saw Paul Butler outside Polk’s house at 2:30 p.m. and that he was shirtless and sweating.
Beatrice Washington said she saw Paul Butler running down Josephine Street to Polk’s house. His shirt was wrapped around his right hand. She said she knew Antoine was expecting a disability check that day or the next.
Wendy Coleman, daughter of Washington, said she saw Paul Butler in Polk’s yard. She said she saw a Gold Seal milk truck in the neighborhood for about an hour around noon with someone sitting in the truck.
Officer Michael Spazido said he presented two photographic line-ups to Kates and *474 that she chose Paul Butler out of the first set and Thomas Butler out of the second.
Donald Clark said he spoke with Detectives Pierce and McCord at the Gold Seal plant on May 2, 1985. He told them he and Thomas Butler stopped by the victim’s house around 3:00 p.m. on the afternoon of the crime, after making a delivery to the westbank and before they returned to the plant so that Thomas could pay his rent. He said he didn’t see any police, but that there was a crowd at the house and he could see blood on the sidewalk. Thomas Butler returned to the truck and showed him a receipt for the rent. Clark also admitted that he was later arrested as an accessory after the fact to this crime.
Louise Kates testified that Antoine knocked on the common wall of their home with a stick. She went to Antoine’s and saw Paul Butler kneeling. He had taken Antoine’s money and gun. Thomas Butler grabbed her and said, “Bitch, what you have to do with it?” Antoine told her she had been arguing with the men over money. Thomas Butler then beat Kates.
Detective Charles Crone testified some blood samples from the scene revealed type “A” blood and the other samples revealed type “B” blood. He said Thomas Butler has type “A” blood, and Paul Butler has type “B”.
The defense called Salvador Sentini, vice-president of Gold Seal, who testified Thomas Butler and Donald Clark left the plant between 11:00 a.m. and 1:00 p.m. to make a delivery on the Westbank.
Connie Lee, mother of Paul Butler’s children, said he did not leave her house until 2:30 or 3:00 p.m., and he left to go jogging. He returned at 3:00 or 3:15 p.m., wearing the same clothes. There was no blood on him.
Stacy Jones, mother of Thomas Butler’s children, testified Thomas was living with her at the time of the crime.
ASSIGNMENT OF ERROR NO. 1
In the first assignment of error the defendants contend that the trial court erred in denying their motion for a new trial.
The defendants .sought the new trial on the basis that the State failed to provide them with certain requested discovery materials, including but not limited to certain exculpatory evidence.
Under the United States Supreme Court decision of Brady v. Maryland, the State, upon request, must produce evidence that is favorable to the accused where it is material to guilt or punishment. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This rule has been expanded to include evidence which impeaches the testimony of a witness where the reliability or credibility of that witness may be determinative of guilt or innocence. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Where a specific request is made for such information and the subject matter of such a request is material, or if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).
In order for the nondisclosure of discovery materials to constitute reversible error the nondisclosure must so prejudical the defendant as to deprive him of his constitutional right to a fair trial. State v. Vaccaro, 411 So.2d 415 (La.1982).
The defendants first argue that the report of Dr. Scrignar, a psychiatrist of Louise Kates, contains exculpatory material in that it cast doubt upon Louise Kates’ identification of the defendants. In particular, the report by Dr. Scrignar indicates that this witness merely got a glimpse of only one man’s face on the date of the commission of the crime and this statement is contrary to her testimony at trial. The report further indicates that this witness’ “memory for recent events is somewhat impaired” and she has a “large depressed fracture at the left top of her skull”, which is an impairment in the area of the brain specifically concerned with recognition or specific sensory stimuli dealing with accurate recall of individuals and events.
The record reveals that the State did not withhold Dr. Scrignar’s report. To the con *475 trary, the record discloses and the trial court correctly found that the State provided this report to the defendants and that Dr. Scrignar, the report’s author, was in Court and available to testify although he was not called to do so by the defendants.
Additionally, the overall contents of the report by Dr. Scrignar were prejudical to the defendants. That is, Dr. Scrignar was of the opinion that Louise Kates was physically and psychologically able to participate in the first photographic line up held by the police. He also postulated that although this eye witness suffered from post traumatic stress disorder that this condition caused her to continually relive the events of the assault as a clear and vivid memory.
As such the defendants’ argument that they were denied Dr. Scrignars’ report which was exculpatory is without merit.
The defendants next complain of the late arrival of Ms. Kates’ Charity Hospital Medical records. They argue that these records reveal Ms. Kates’ severe vision problems, and prior psychiatric problems.
We find no prejudice with regard to this discovery material. The medical records were not in the custody of the State of Louisiana but rather were with their custodian, Charity Hospital. As such, any delay in their delivery was attributable to the defendants who issued the subpoena duces tecum for the records’ delivery or to their custodian, Charity Hospital. The delay, if any, is not attributable to the State.
Furthermore, the record reveals that, at trial, the defendants examined Louise Kates concerning the alleged exculpatory materials contained in these records. That is, she was examined regarding her impaired vision, the effect of her head injury upon her ability to remember and her actions in talking to God and her dead husband.
The defendants’ final argument on this issue is that they were prejudiced by the State’s untimely delivery of a statement made by Elizabeth Kates. In the statement Ms. Kates allegedly told police officers that she saw defendant Thomas Butler knock on the door at 2119 Magnolia Street and then walk away from the door, board a yellow milk truck and drive away. Elizabeth Kates did not testify at the defendants’ trial.
At the hearing on the Motion for New Trial the district court judge made the following finding regarding the statement by Elizabeth Kates:
The Court:
* * * JjC ⅜! ⅜«
As to Ms. [Cjates, the witness that no one has been able to find, the Court cannot attest any bad faith to the State of Louisiana that they have hidden a witness. They have no information which would have been made available to them in order to find her. All the last addresses or residences where they attempted to locate her, those attempts to locate her were met with negative results. As I understand, as I appreciate it, there were attempts made to locate the witness and that those attempts were met with negative results.
* * * * * Sjc
THE COURT:
As I recall, when I asked to review the State’s entire file and which I in fact did at your request, I believe that was some of the information which was provided to you concerning what testimony Ms. [Cjates would give. I think I would have given you the information that I would retrieve by viewing their file in an attempt to assist you in your defense if you wished to locate her. Again, I can only go by the information which was located in the State’s file, which I turned information over to you because I felt it was exculpatory and I felt it would assist you in your defense. Again, the point I make by that is the State was in no way in bad faith because they did turn over the file. The Statement of Elizabeth [Cjates was in the record and that statement was made, that existence of that statement was made aware to you and the last known address which *476 would have been present in their file, would have been presented to you after my reviewing the file.
* * * * * *
Since the defendant was provided with the Kates’ statement and last known address and since the State’s failure to produce this witness for trial did not result from bad faith, we find no error in the ruling of the trial judge wherein he denied the defendant a new trial on the basis of this untimely disclosure of exculpatory material. There has been no showing that had the State’s information on this witness been provided timely that she could have been produced for trial. Rather, that does not appear to be the case, for the trial court noted, at the hearing on the Motion for New Trial, -that the defendants have been looking for this witness for eleven months to no avail.
For these reasons the trial judge correctly found that the defendants failed to bear their burden of proof. We find no error in his denial of the defendants Motion for a New Trial. Assignment of Error No. 1 lacks merit.
ASSIGNMENT OF ERROR NO. 2
In their second assignment of error the defendant contends that the State did not present sufficient evidence to prove that they were guilty of first degree murder.
They reason that the State failed to prove that these defendants perpetrated the crime. In particular they argue that Louise Kates’ identification was untrustworthy due to her impaired eyesight and psychological illness.
The defendants were charged with and convicted of first degree murder. First degree murder is defined as “the killing of a human being: when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.” La.R.S. 14:30(A)(3).
In reviewing a conviction to determine whether there exists sufficiency of the evidence, we utilize the standard established by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That is, we must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty of the essential elements of the crime beyond a reasonable doubt.
In State v. Porretto, the Louisiana Supreme Court discussed the Jackson case supra, in light of this state’s rule concerning circumstantial evidence. La.R.S. 15:438, 468 So.2d 1142 (La.1985). In Porretto, supra at 1146 the Court stated:
The constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), required that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 mandates that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” This is not a purely separate test from the Jackson standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis for the conviction. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. State v. Wright, 445 So.2d 1198 (La.1984).
In making this determination regarding the sufficiency of the evidence it is not the province of this court to assess the credibility of witnesses unless the trial court’s finding is clearly contrary to the evidence. State v. Cashen, 544 So.2d 1268 (La.App. 4th Cir.1989) citing State v. Vessell, 450 So.2d 938 (La.1984).
In this case, Louise Kates identified the defendants through two photographic line-ups as having been the two men who were inside Ms. Antoines’ house on the *477 date of this incident. She stated that she saw Paul Butler kneeling in front of Ms. Antoine and he had Ms. Antoine’s gun and money. She also identified Thomas Butler as the assailant who hit her in the head. Other witnesses established that Paul Butler was seen in the area of the crime and a truck owned by Thomas Butler’s employer was also spotted in that area. Blood sample evidence taken from the scene and matched to the two defendants’ blood types was also presented at trial. This identification evidence was sufficient for the trial court to conclude that these defendants were the perpetrators of this crime. We find no error in that regard.
Additionally, both victims were badly beaten and an inference can be drawn from this fact that there existed an intent to kill or inflict great bodily harm. La.R.S. 15:445. State v. Banks, 496 So.2d 1099 (La.App. 4th Cir.1986).
No evidence established which brother killed Antoine, and no evidence established that Paul Butler intended to inflict bodily harm on Kates. The evidence does establish that Thomas intentionally inflicted great bodily injury on Kates, but without evidence that Thomas killed Antoine, a reasonable hypothesis remains that Paul killed Antoine while Thomas beat Kates. As such, the evidence is insufficient to support first degree murder convictions.
In State v. Andrews, 452 So.2d 687 (La.1984) the Louisiana Supreme Court recognized the court’s right to modify the verdict in a murder case and render a judgment of conviction on a lesser included responsive offense. The Court in Andrews, supra at 689 stated:
This court, pursuant to C.Cr.P. 821(E), has the power to modify the verdict and render a judgment of conviction on a lesser included responsive offense. Second degree murder is a responsive verdict to first degree murder. C.Cr.P. 814(A)(1). R.S. 14:30.1(1) defines second degree murder as “the killing of a human being ... [w]hen the offender has a specific intent to kill or inflict great bodily harm.” Second degree murder carries a mandatory sentence of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The record clearly supports a conviction on such a charge.
In this case, the evidence does establish that one brother had the specific intent to kill or inflict great bodily harm on Antoine such that second degree murder would be supported. The other brother was a principal to that killing. Accordingly, since convictions for second degree murder are supported by the record, we modify the defendants’ conviction to that of second degree murder. La.R.S. 14:30.1A(1). The convictions (as modified) and the sentences[1] are affirmed.
THE CONVICTIONS1 AS MODIFIED AND THE SENTENCES ARE AFFIRMED.

. The sentences for second degree murder are the same as the sentences imposed for first degree murder.