544 So.2d 1268 (1989)
STATE of Louisiana
v.
John R. CASHEN.
No. 88-KA-2052.
Court of Appeal of Louisiana, Fourth Circuit.
May 25, 1989.
*1269 Harry F. Connick, Dist. Atty., Beryl McSmith, Asst. Dist. Atty., New Orleans, for plaintiff-appellee State.
John H. Brooks, Gretna, for defendant-appellant John Cashen.
Before BARRY, KLEES and ARMSTRONG, JJ.
KLEES, Judge.
On August 12, 1986, the appellant John R. Cashen was charged with theft of property valued over $500.00. He was arraigned on January 27, 1987, and pled not guilty. On October 22nd, he waived his right to jury trial, and was tried before a Judge. On November 24th, the court found him guilty as charged, and later sentenced to five years at hard labor, suspended, and placed on five years probation with the condition that he serve two years in parish prison as part of his probation, and make restitution. On May 10th, this sentence was amended to delete the condition of two years imprisonment and to add the condition that he perform 100 days of community service within three years. From his conviction and sentence Cashen appeals.
FACTS:
From October, 1984 through September, 1985, the defendant John Cashen was the president of the New Orleans Athletic Club (hereinafter referred to as N.O.A.C.). During that period, N.O.A.C. had a money tree account at Elmwood Federal Savings and Loan. During that same period Cashen and his wife Hilda had a joint checking account at that institution, as did Cashen and his girlfriend Cheryl Snelson. Cashen and N.O.A.C.'s manager Raymond Schmidt were authorized to issue checks on the N.O.A.C. account, and their signatures were on the signature card for that account. Ms. Florence Wagner, employed in the accounts division of Elmwood, testified that on January 29, 1985, a check in excess of $80,000.00 (S-6)[1], made payable to N.O. A.C, was deposited in Cashen's joint account with his wife. Ms. Wagner testified that the check had not been endorsed prior to its deposit. She testified that on March 4th, two large cash withdrawals were made from that account, totalling $79,000.00. Ms. Wagner also testified as to various other checks, withdrawals, and transfers made from the N.O.A.C. account to Cashen or to Ms. Snelson or to their joint account, including cash withdrawals from the N.O. A.C. account by Cashen on May 24, 1985 for $511.70 (S-9), on July 19, 1985, for $3000.00 (S-10), and on June 20, 1985 for $4000.00 (S-11). Concerning a telephone transfer request whereby $2000.00 was transferred from the N.O.A.C. account to the Cashen/Snelson account, Ms. Wagner testified that she did not remember the actual telephone request, but she also testified that she would not have authorized the transfer unless she recognized the voice of the person making such request, and Cashen's voice was the only voice from N.O. A.C. which she recognized.
Raymond Schmidt testified that he was the general manager of N.O.A.C. at the time Cashen was the president, and Schmidt testified that Cashen had the power to fire him. Schmidt testified that under Cashen's direction and threats, he issued many checks to Cashen and his friends, and Schmidt's secretary Cindy Martinez also gave Cashen money out of N.O.A.C.'s petty cash account. Schmidt testified that in 1984, N.O.A.C. received a check from the Greater New Orleans Runner's Club for N.O.A.C.'s proceeds from the Turkey Day Run it co-sponsored. Schmidt testified that when that check was received and deposited in N.O.A.C.'s account at the Whitney Bank, Cashen directed him to issue a check payable to cash in the same amount. This check was then cashed by Cashen (S-13).
Schmidt also testified that a party was thrown on February 2, 1985, at the direction of Cashen for his friends, only a few of which were members of the club. The party was held at N.O.A.C, but Cashen did not pay any rental for the use of the room, which usually rented for $250.00, even to members. Schmidt identified receipts for this party for seafood (S-14), liquor (S-15), and food (S-16), in the *1270 amounts of $127.50, $475.24, and $125.13, respectively. Schmidt testified that these bills were paid out of petty cash. He insisted that when he questioned these expenditures, Cashen told him to mind his own business and pay the bills or he could lose his job. Schmidt testified that Cashen was not authorized to make these expenditures. Schmidt testified that an additional bill for $210.14 (S-26) was paid out of petty cash on June 20th to pay for wine and champagne Cashen used on a picnic to the Gulf Coast with Ms. Snelson.
Schmidt testified that Cashen allowed the Pendennis Club, to use a dining room at N.O.A.C for luncheons while the Pendennis Club was being renovated. Schmidt testified that during this eight-month period, the Pendennis club did not pay rent for the room. He also testified that Shirley Saucier, who worked as a waitress for the Pendennis members, was paid out of petty cash by N.O.A.C. at Cashen's direction (S-18). Schmidt indicated that Ms. Saucier was related to Mrs. Rodriguez, a friend of Cashen and the manager of the Pendennis Club. Schmidt maintained that he only paid Ms. Saucier's salary because Cashen insisted he do so.
Schmidt testified that N.O.A.C. was presented with bills from the Holiday Inn/Chateau Le Mayne for rental of a room at that hotel for two nights (S-19). Schmidt testified that Cashen and Ms. Snelson spent both nights at the hotel, and Cashen directed him to pay the bills.
Schmidt also testified that on many occasions Cashen would direct him to take money out of petty cash and give it to him. He testified that in each instance, Cashen directed him to prepare a "payout slip" which he would sign later, but Cashen never did sign any of these slips. He testified that Cashen received $200.00 on June 14th (S-22), $300.00 on June 19th (S-23), $150.00 on July 23rd (S-24), $125.00 on August 29th (S-25), and $500.00 on an unspecified date (S-17). Schmidt testified that with respect to the last amount listed above, Cashen originally asked for and received $400.00 and then later asked for and received an additional $100.00. Schmidt also testified that on June 7th, Cashen called him from the Fairmont Hotel and told him to bring him all the $100.00 bills contained in petty cash. Schmidt and Ms. Martinez xeroxed the bills (S-20) and prepared a payout slip for them (S-21), and then Schmidt put all nine of them in an envelope and took them to the Fairmont where he gave them to Cashen. Cashen also once directed Schmidt to issue a check, leaving the payee blank, for the amount of deposits from members received that day. That check, in the amount of $425.68 (S-7), was eventually deposited by Cashen into his F.N.B.C. account. In addition, Schmidt was directed to issue another check in the amount of $696.67, leaving the payee blank, which was eventually cashed by Ms. Snelson (S-8). Schmidt testified that Ms. Snelson did not work for N.O.A.C.
Schmidt maintained that Cashen failed to repay any of the amounts listed above.
On cross-examination, Schmidt admitted that he was eventually fired by N.O.A.C, but he insisted it was because he was "in over my head", not because he was suspected of collusion with Cashen. He admitted that the payout slips were signed either by Ms. Martinez or him, but they were done so at Cashen's direction. He testified that the February 2nd party was given to promote a new chef hired by N.O.A.C., but he insisted that the party was Cashen's idea. He also testified that Cashen negotiated with the caterer for the June picnic. Schmidt admitted that his wife is an executive secretary at the Holiday Inn where Cashen stayed and that she could probably get complimentary rooms, but he insisted that the hotel bill N.O.A.C for the room rental and that Cashen told him that he and Ms. Snelson used the rooms. He testified that although he was authorized to sign checks on the N.O.A.C. Elmwood account, he had called that institution in the past to get an account balance and was unable to do so because the people there did not know his voice. Schmidt testified that Cashen also entertained other women at N.O.A.C., and he maintained that these women could not have been members because that club at that time did not accept women as members.
*1271 James Dupuis, the crime lab document examiner for N.O.P.D., testified that he examined various documents introduced in connection with this case and was of the opinion that the documents had a common authorship, but he was unable to say whether these documents were authored by Cashen. He testified that the exemplors given by Cashen, however, did not look like normal writing but rather looked like they had been made by someone trying to disguise his handwriting.
Bob Crockett, the former president of N.O.A.C. who preceded Cashen, testified that during his tenure the stockholders of N.O.A.C. agreed to sell property owned by the club in an effort to reduce its debt to the Whitney Bank. He testified that he negotiated the sale of the property, and the check on the balance of the sale price of the property was given to him (S-6, in the amount of $80,774.00). He testified that he asked Cashen for a deposit slip for the N.O.A.C. account at Elmwood because he was going to deposit the check on his way home. However, Cashen declined, telling Crockett that he would deposit the check. Crockett testified that Cashen was not authorized to deposit the check into his personal account. He testified that when he was president he never took money out of petty cash nor did he entertain at N.O.A.C. at the club's expense, and in fact the president did not have the authority to do so. Crockett testified that N.O.A.C. had financial problems. He testified that Cashen knew of the Whitney debt and that the loan was in arrears. He also denied that he and Ms. Martinez were romantically involved.
Cindy Martinez, Schmidt's secretary, also testified as to the financial transactions which Schmidt recounted. She testified that she paid the bills for the February 2nd party on Cashen's orders. She testified that she knew he did not reimburse N.O. A.C. for this expense because if he had done so the money would have had to go through her. She testified that Cashen directed her to issue a check payable to cash for the identical amount of the check N.O.A.C. received for the Turkey Day Run. With respect to S-17, the payout slip for $500.00, she testified that Cashen, while in the company of three women, asked her how many $100.00 were in petty cash. He then directed her to give him $400.00 and told her to see Schmidt about the payout slip. Approximately one hour later, Schmidt told her to give Cashen an additional $100.00. Regarding the bill for two nights at the Holiday Inn, Ms. Martinez testified that she heard Cashen tell Schmidt to arrange for the room through Schmidt's wife, who worked at the hotel. She testified that the room was booked in Cashen's name, and she paid the bill at Cashen's direction. She also testified that Cashen did not reimburse N.O.A.C. for any of these expenditures. Ms. Martinez indicated that Cashen directed her to pay Shirley Saucier's salary, even though Ms. Saucier worked only for the Pendennis Club, and that the Pendennis Club did not reimburse N.O.A.C. for Ms. Saucier's salary.
With respect to the $900.00 delivered to Cashen at the Fairmont, Ms. Martinez testified that Cashen did not repay this money. She testified Cashen told her the money had been stolen when he was mugged in an elevator at the Fairmont Hotel, but he did not call the police to report the incident because a woman was involved. She also testified that with respect to the June picnic, she observed Ms. Snelson and a man from a catering company making sandwiches at the club, and Ms. Martinez was directed to buy a basket for the food and Schmidt was directed to buy some champagne for the picnic. Ms. Martinez testified that N.O.A.C. was not reimbursed for these expenses.
Ms. Martinez testified that because the financial situation of the Club became so bad, she began hiding the money in the petty cash fund so that Cashen would not take all the money. She testified that Cashen directed Schmidt to fire her at one point when he discovered this, but she admitted that she was not fired. She testified that Cashen also directed her to prepare membership cards for his friends, even though dues were never paid for these memberships. She testified that she did as Cashen directed because he had told her to mind her own business and had *1272 threatened to fire her if she did not follow his orders. She testified that she was afraid to report Cashen's actions to the board or to the police because of his friendship with members of both entities. She testified that she finally spoke with John Wilkinson when she had gathered enough evidence and when she was about to go on maternity leave. She denied having a romantic involvement with Schmidt, and denied kissing him passionately at a party at Kolb's.
John Wilkinson, an attorney and longtime member of N.O.A.C., testified that in 1985 the members of the board of N.O.A.C. were upset because Cashen would not call meetings. He testified that Ms. Martinez met with him sometime in June, 1985, and told him of Cashen's financial transactions with N.O.A.C. He testified that he began an investigation of these allegations and then asked the N.O.A.C. treasurer, Mr. Williams, to evaluate the records of the Club. Williams also investigated and then gave him his report. Wilkinson then met with the board, but Cashen was not present at this meeting, and he was not seen around the Club very often after this time. Wilkinson testified that the petty cash journals and some cancelled checks disappeared soon after Cashen stopped coming daily to the Club. He testified that a letter of impeachment was sent to Cashen, ordering him to appear before the board, but Cashen ignored this letter. Wilkinson testified that the bylaws of the Club did not allow the president to take money from petty cash nor to use N.O.A.C. facilities rent free without authorization from the board, and no authorization was given for the use of N.O.A.C. facilities for the February 2nd party or for the Pendennis Club. The bylaws also did not allow the president to buy food and drink or charge hotel rooms for his personal use, nor did they allow him to authorize the payment of salaries for non-employees. Wilkinson testified that Schmidt and Ms. Martinez were not having an affair; indeed, he testified that Ms. Martinez had married another N.O.A.C. employee not too long before she told him of Cashen's actions. Wilkinson admitted that he was the attorney for N.O.A.C. in a civil suit against Elmwood for its deposit of the $80,774.00 N.O.A.C. check.
Shirley Saucier, a defense witness, testified that she was hired by Schmidt, not by Cashen, to work for the Pendennis Club while it was relocated at N.O.A.C. She testified that she was always paid in cash by Ms. Martinez. She testified that she was the sister of Lorraine Rodriguez, the manager of the Pendennis Club.
Lorraine Rodriguez testified that Schmidt, not Cashen, made the arrangements with the Pendennis Club to relocate at N.O.A.C. during the renovations to its building, but she admitted that Cashen invited the Pendennis Club to relocate and that no rental was paid for its use of N.O. A.C. facilities. She testified that each week she paid N.O.A.C. for the food consumed by Pendennis Club members. Although she testified that Ms. Martinez and Schmidt had more than a business relationship, she could not testify as to any actual instances which supported this conclusion.
Off. David Gibbons, employed in the Forgery Division of N.O.P.D., testified that he attended the February 2nd party at the invitation of Cashen. He testified that Cashen told him it was a promotional party to feature the new chef hired by N.O.A.C., and Schmidt was at the party introducing the chef to everyone. He also testified that he was present at the 1984 N.O.A.C. Christmas party held at Kolb's, and he saw Schmidt and Ms. Martinez in a passionate embrace. He later testified, however, that Mrs. Schmidt was also at that party. Gibbons admitted that he joined N.O.A.C. at the invitation of Cashen and that Cashen told him he would pay for his membership. Gibbons then let his membership lapse when the period for which Cashen paid ended.
Hilda Cashen, the defendant's wife, testified that she and Cashen realized the $80,774.00 check had been deposited in their account when they received their bank statement at the beginning of March, 1985. She testified that on March 2nd they withdrew $39,000.00 in cash from their account to reimburse N.O.A.C. She indicated, however, that they did not actually give N.O. *1273 A.C. this money until March 12th, when she and Cashen personally gave this money to Schmidt, along with a receipt which all three signed, a copy of which they retained (D-5). She testified that on March 17th, they took $41,000.00 in cash to N.O.A.C. and gave it to Schmidt, and then had him sign a receipt (D-6). She testified that the $41,000.00 was cash that the Cashens had at their house, which they had gotten from Cashen's mother when she went into a hospital. She admitted that Cashen's sister had filed suit against them concerning the mother's succession, but she denied the suit had any connection with this money. She testified that they repaid the $80,000.00 in cash because they had been advised by an attorney friend to do so because less questions would be asked. She testified that she did not know if the additional $774.00 were repaid. However, she insisted that her husband had loaned money to N.O.A.C. in the past to enable it to meet its payroll.
Mrs. Cashen admitted that she knew of her husband's affair with Ms. Snelson when a private investigator she hired caught them together at a hotel. She testified she knew he had been paying for Ms. Snelson's apartment, but she was unaware $2000.00 had been transferred into the Cashen/Snelson account. Mrs. Cashen denied that Cashen had purchased a Mercedes-Benz for her use which he had returned when she indicated that she did not like how it drove, maintaining that they had merely rented the car temporarily.
John Cashen denied all of the allegations made against him. With respect to the $80,774.00 check deposited into his account, he testified that Schmidt gave him the check while he was having lunch with Crockett and Schmidt told him to sign it. He insisted that the account number he placed on the check, his personal number, was a number given to him by Schmidt. He insisted that at the same time he gave Schmidt a deposit slip from his personal account, and asked Schmidt to deposit his paycheck into his account. He theorized that Schmidt actually deposited the N.O. A.C. check into his account. He testified that a suit was pending between N.O.A.C. and Elmwood as to how the check could have been accepted for deposit in that account. He insisted he knew nothing about the money disbursed in connection with the payout slips, pointing out that none of them contained his signature. He maintained the checks written to him were in reimbursement for money he had spent in connection with N.O.A.C. He testified he paid $32,000.00 to the Whitney Bank on an N.O.A.C. loan which was overdue and for which he had become personally liable as a condition of his presidency of N.O.A.C. (D-9). He testified he was unaware of the checks written to Ms. Snelson, and he denied authorizing the telephone transfer of money from the N.O.A.C. account into his joint account with Ms. Snelson, insisting that he told Elmwood not to transfer any funds from the N.O.A.C. account from telephone requests.
Cashen testified that he reserved the room at the Holiday Inn for Schmidt and then gave Schmidt the key to the room. He denied using the rooms and maintained that he thought N.O.A.C. was getting complimentary rooms. He denied any knowledge of the June picnic. With respect to the February 2nd party, Cashen insisted the party was Schmidt's idea, as a promotion to advertise the hiring of the new chef. He admitted that he invited eight people to the party, but insisted that Crockett had also invited other people to attend. He admitted throwing a party for Ms. Snelson's daughter, but he insisted he paid for it. He maintained that the board of directors made the agreement with the Pendennis Club to use N.O.A.C. facilities during the renovation.
Cashen testified that he did not have the authority to fire Schmidt or Ms. Martinez, but rather that authority was vested in the board of directors. He testified that he tried to resign as president in May, 1985, but the board would not accept his resignation because no one else wanted to be the president because of the stipulation that he would become responsible for the Whitney debt. However, Cashen admitted that this stipulation was not contained in the N.O. A.C. bylaws.
*1274 Cashen testified that he had a prior conviction in 1977 for theft, but he maintained that he had not committed the crime. He testified that he had worked in the purchasing department of a company and that someone had used his rubber stamp to requisition equipment used in horse raising. He testified that he kept horses at that time, and the items seized by the police in connection with that case belonged to him and had been paid for by him. He insisted that he had pled guilty to the charge because his attorney advised him it was the quickest and easiest way to end the controversy. He denied confessing to the police or being identified by the store clerk in connection with that theft.

Errors Patent
A review of the record for errors patent reveals there are none.

Assignment of Error
By his sole assignment of error, the appellant contends that the trial court erred by finding him guilty based upon hearsay testimony. Specifically, he points to the testimony of John Wilkinson, the member of N.O.A.C. who initiated the investigation into the appellant's financial dealings with the club. However, in the passage quoted by the appellant, concerning the investigation by Wilkinson and Williams, the defense counsel objected on the basis of the relevancy of the testimony, not on the basis of hearsay. A new basis for an objection cannot be raised for the first time on appeal. State v. Johnson, 489 So.2d 301 (La.App. 4th Cir.1986). The defense attorney objected five times during the direct examination of Wilkinson, and in three of these instances, the basis of the objection was relevancy. (Tr. 131; 134 [the quoted passage]; 136) In two instances the defense attorney objected on the basis of hearsay. However, in the first instance, the testimony concerned Ms. Martinez' husband's advice to her to contact Wilkinson, after which objection the court noted it would disregard any hearsay in connection with that statement. In the other instance, the defense objected when Wilkinson was asked whether Cashen had repaid the $80,000.00 which was deposited in his account:
MR. DESALVO:
I believe the records should speak for themselves. If they want to introduce the records to show the payments weren't made, that's fine. This witness is clearly testifying from hearsay.
THE COURT:
I agree it might not be within his knowledge without hearsay.
MR. RIEHLMANN:
Judge, what he is saying is that he reviewed the records and he is telling us what his observations from the records are.
MR. DESALVO:
That's hearsay in its purest form. The records speak for themselves.
The prosecutor then asked Wilkinson if he ever saw a check from Cashen in repayment of the money, and Wilkinson replied he had not. He also testified that he directed a letter to Cashen requesting that he repay these funds. When asked if the funds were repaid, Wilkinson replied they had not been repaid. The defense failed to object to this last question.
It does not appear that the court considered any hearsay testimony which was admitted over the objection of the defense. The appellant's trial was held before a judge who indicated in one instance that he would disregard any hearsay testimony. Even if, as the appellant contends, $80,000.00 was repaid for the check which was deposited into his personal account (D-5 and D-6 are signed receipts for $80,000.00), there is no indication that he paid the remaining $774.00 from the check which was deposited in his account. In addition, the State introduced over thirty exhibits showing that the appellant received an aggregate amount very much in excess of $500.00 from N.O.A.C., money he was not authorized to take. Ms. Martinez and Schmidt both testified, with no objection by the defense, that this money was not repaid to N.O.A.C. The appellant did not produce any evidence that this money had been repaid.
*1275 The appellant also contends that the evidence against him was suspect because the payout slips were not signed by him. However, Ms. Martinez and Schmidt both testified that they gave the appellant the money represented by the payout slips pursuant to his orders and under threat of termination of their employment. The trial court apparently believed the testimony of Mr. Schmidt and Ms. Martinez over that of the appellant, and it is not the province of this court to assess the credibility of witnesses unless the trial court's finding is clearly contrary to the evidence. State v. Vessell, 450 So.2d 938 (La.1984); State v. Turner, 499 So.2d 1282 (La.App. 4th Cir.1986). Although the appellant theorizes that the payout money went to Schmidt and Ms. Martinez, perhaps in furtherance of their "affair", the trial court apparently chose not to believe the testimony from two defense witnesses, one of which thought something might be going on between them and the other of which testified to passionate kissing between them at a party also attended by Mr. Schmidt's wife.
It does not appear that the trial court abused its considerable discretion by believing the testimony of Schmidt and Ms. Martinez over that of the appellant and the defense witnesses. Their testimony certainly does not rise to the level of incredibility of that of the victim in State v. Mussall, 523 So.2d 1305 (La.1988), which would cause this court to discount their entire testimony. Even though the appellant showed evidence that he repaid $80,000.00, there still was no evidence that he repaid the remaining $744.00 on the check placed in his account or that he ever repaid the rest of the money obtained from N.O.A.C., money he was not authorized to receive. Viewing the evidence in the light most favorable to the prosecution, the trial court could very well have found the appellant guilty of theft of property valued at least $500.00 beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987). This assignment has no merit.
Accordingly, the appellant's conviction and sentence are hereby affirmed.
AFFIRMED.

APPENDIX

STATE EXHIBITS
S-1 Signature card, N.O.A.C. account at Elmwood Federal Savings and Loan (Tr. 6)
S-2 Monthly statements on account of Mr. & Mrs. John Cashen at Elmwood (Tr. 7)
S-3 Monthly statements on account of John Cashen/Cheryl Snelson at Elmwood (Tr. 8)
S-4 Signature card, Cashen/Snelson account (Tr. 9)
S-5 Deposit slip for $80,774.00, deposited into Cashen/Cashen account (Tr. 12)
S-6 Check in amount of $80,774.00, payable to N.O.A.C., deposited in Cashen/Cashen account (Tr. 10)
S-7 Check in amount of $425.68, payable to Cashen from N.O.A.C. account, deposited into unknown F.N.B.C. account (Tr. 15)
S-8 Check in amount of $696.67, payable to Snelson from N.O.A.C. account, cashed by Snelson (Tr. 17)
S-9 Cash withdrawal by Cashen from N.O.A.C. account on 5/24/85 in amount of $511.70 (Tr. 18)
S-10 Cash withdrawal by Cashen from N.O.A.C. account on 7/19/85 in amount of $3000.00 (Tr. 19)
S-11 Cash withdrawal by Cashen from N.O.A.C. account on 6/20/85 in amount of $4000.00 (Tr. 19)
S-12 Telephone transfer request from N.O.A.C. account on 7/24/85 to Cashen/Snelson account in amount of $2000.00 (Tr. 19)
S-13 Check payable to cash from N.O. A.C. Whitney account in amount of $3428.00, cashed by Cashen (Tr. 36)
S-14 Receipt from Fatty's Seafood Market, dated 2/1/85 in amount $127.50, for party held 2/2/85 (Tr. 39)
*1276 S-15 Receipt from French Quarter Wine Cellar, dated 1/28/85 in amount $475.24, for party held 2/2/85 (Tr. 40)
S-16 Receipt from Schwegmann's, date unknown in amount of $125.13, for party held 2/2/85 (Tr. 40)
S-17 Payout slip from N.O.A.C. petty cash in amount $500.00 (Tr. 44)
S-18 Payout slips from N.O.A.C. petty cash, dated 3/29/85 to 11/19/85, in payment of salary for Shirley Saucier (Tr. 47)
S-19 Bill from Holiday Inn/Chateau LeMoyne for room for nights 5/6/85 and 5/7/85 (Tr. 50)
S-20 Xerox copies of nine $100.00 bills (Tr. 53)
S-21 Payout slip from N.O.A.C. petty cash in amount of $900.00 (Tr. 53)
S-22 Payout slip from N.O.A.C. petty cash in amount $200.00, dated 6/14/85 (Tr. 54)
S-23 Payout slip from N.O.A.C. petty cash in amount $300.00, dated 6/19/85 (Tr. 55)
S-24 Payout slip from N.O.A.C. petty cash in amount $150.00, dated 7/23/85 (Tr. 55)
S-25 Payout slip from N.O.A.C. petty cash in amount $125.00, dated 8/29/85 (Tr. 56)
S-26 Payout slip from N.O.A.C. petty cash in amount $210.00, dated 6/20/85 (Tr. 56)
S-27 Handwriting exemplor of Cashen given 3/30/87 (Tr. 80)
S-28 Handwriting exemplor of Cashen given 10/9/87 (Tr. 80)
S-29 Handwriting exemplor of Schmidt given 3/27/87 (Tr. 78)
S-30 Report on comparison of exemplors (Tr. 80)
S-31 Statements of Cashen F.N.B.C. account (Tr. 154)
S-33 Minute entry of prior conviction of Cashen (Tr. 251)
DEFENSE EXHIBITS
D-1 Management report prepared by Schmidt (Tr. 63)
D-2 Bylaws of N.O.A.C. (Tr. 67)
D-4 Letter from Cashen to Sims, contents unknown (Tr. 143)
D-5 Receipt for $39,000.00 in cash, signed by both Cashens and by Schmidt (Tr. 192)
D-6 Receipt for $41,000.00 in cash, signed by both Cashens and by Schmidt (Tr. 197)
D-7 Invitation to N.O.A.C. party in honor of Crockett (Tr. 232)
D-8 Letter from Gamble to Cashen, criticizing money management but indicating that $80,000.00 had been repaid (Tr. 237)
D-9 Check written by Cashen to Whitney in amount of $32,000.00 for payment on Whitney note (Tr. 240)
D-10 Cashen's letter of resignation (Tr. 242)
NOTES
[1] See list of exhibits in appendix.