619 So.2d 770 (1993)
STATE of Louisiana
v.
Dino CINEL.
No. 92-KA-0913.
Court of Appeal of Louisiana, Fourth Circuit.
May 27, 1993.
*771 Harry F. Connick, Dist. Atty., Hans P. Sinha, Asst. Dist. Atty. and Wessel, Bartels & Ciaccio, Law Corp., William F. Wessel, Victoria L. Bartels, New Orleans, for plaintiff-appellant State of LA.
Arthur A. Lemann, III, Martha L. Adams, Arthur A. Lemann, III & Assocs., Edwin A. Stoutz, Jr., New Orleans, and Franz L. Zibilich, Metairie, for defendant-appellant Dino Cinel.
Before KLEES, BYRNES and LOBRANO, JJ.
KLEES, Judge.
On May 21, 1991, the appellant was charged with possession of commercially-made items of child pornography.[1] He was arraigned on May 28th and pled not guilty. Defendant filed various motions, including a motion to quash the bill of information, which was granted on January 10, 1992. The State appeals. We reverse.

FACTS
The defendant Dino Cinel was a priest assigned to St. Rita's Catholic Church in New Orleans from November, 1979 through December, 1988. He lived at the parish rectory in a suite of rooms for which he had the key, but which was also unlocked most of the time in order to allow the communal housekeeper access for cleaning and laundry purposes. On December 28, 1988, Cinel left New Orleans to visit his family in Italy, and he left his car with his friend Linda for her use during his absence. Later that day, Linda locked the keys in the car and called the rectory to ask if someone could look in Cinel's room to see if there was a spare set of car keys. Father Tarantino, the pastor of the parish, entered the room and began looking through the desk drawers for the keys. During his search, he found catalogs for pornographic videotapes. Under these catalogs, he found unsealed manila envelopes which contained pornographic photographs of young men. Because Father Tarantino had a meeting to attend at that time, he put the materials back in the drawer and locked the door to Cinel's suite. He went back into the room later that night, searched the desk and a locker, and found more photographs, magazines, and homemade and commercial videotapes involving young men or boys. Father Tarantino contacted the Archdiocese of New Orleans the next day and was told to box up the materials. The materials were turned over to attorneys for the Archdiocese over Cinel's objection.
In January, 1989, Cinel retained William Campbell, a former Orleans Parish assistant district attorney, to help him retrieve the materials taken from his room. Campbell kept in contact with the attorneys for the Archdiocese concerning the return of these materials until March, 1989, when the materials were turned over to the Orleans Parish district Attorney's office. Campbell testified that soon after the transfer, he saw the district Attorney, Harry Connick, *772 at Tulane University and spoke to him about the materials. Connick told him to contact George Tolar, the New Orleans Police Department officer who was the chief investigator for the Orleans Parish district attorney's office. Campbell testified that he spoke with Connick another time at his office, and Connick again directed him to Tolar. Campbell contacted Tolar, who repeatedly told him that his office was not really interested in the commercially-made materials, but that it was investigating the homemade videotapes and photographs to see if the young men contained in them were juveniles, a concern shared by the Archdiocese. Campbell testified that all through April and May, 1989, he kept in contact with Tolar and attempted to talk to an assistant district attorney who was in charge of the case, but in each instance he was told by various members of the office that Tolar was in charge of the case.
Campbell testified that in early May, Tolar told him that the State had decided not to indict or charge Cinel. The next week, however, a television reporter began asking questions about the case, and Campbell testified that he "became aware" that Tolar was taking another look at the case. At that point, Campbell spoke with Tolar and offered to produce the males in the videotapes to prove they were not juveniles, if in return the State agreed not to charge Cinel. Campbell testified that Tolar agreed, stating: "Yes, if you can prove to me that those are adults, then the case goes away. There's not a case." Campbell testified that he was negotiating in good faith that "either we get charged with whatever they can prove or if we can prove that there's no crime in here, we don't get charged with anything." Campbell maintained that Tolar repeatedly assured him that the State was not interested in the commercially-made materials, but only in the homemade materials.
In response to this agreement, Campbell contacted two of the men in the videotapes, Chris Fontaine and Ronald Tichenor, and had them execute affidavits swearing that they were at least seventeen years old when the videotapes were made. Campbell gave Tolar the affidavits and copies of Tichenor's and Fontaine's driver's licenses in May, 1989, and Campbell testified that at that time Tolar reiterated that Cinel would not be charged in connection with the videotapes or the pornography. In his office notes from August, 1989, Campbell wrote: "Tolar indicated to me on the phone that he was of the impression or opinion that he would probably not recommend prosecution for these offenses, but he did not guarantee it. That resulted this time." Campbell continued to be in contact with Tolar through September, 1989, when Tolar told him that he was satisfied that Fontaine and Tichenor were adults when the videotapes were made.
Campbell testified that he had no further contact with Tolar concerning this case until March, 1990, when he happened to be at the district attorney's office on an unrelated matter. At that time, he saw David Paddison, a former Orleans Parish assistant district attorney who was a practicing attorney, and Gary Raymond, a former investigator for the district attorney's office who was now a private detective, in Tolar's office discussing the materials seized from St. Rita's. At that time, he discovered that Paddison was representing Fontaine in a civil suit against the Archdiocese and Cinel. Campbell was no longer representing Cinel at that time.
Campbell reiterated that early in the negotiations he had tried to talk to the assistant district attorney in the screening division handling the case "to make sure that I was talking with the person who could make the decision in the office", but he was always referred to Tolar. The case was never funnelled through the screening division. He testified that Tolar told him that if he was satisfied that the males in the videotapes were not juveniles "then I'm not going to charge you cause there's not an offense" and then later told him: "we're not going to go forward." Campbell testified that he believed Tolar was authorized to represent the District Attorney's office in the matter.
George Tolar denied promising Campbell that Cinel would not be prosecuted on any charges if he produced evidence that the *773 males in the homemade videotapes were not juveniles when the tapes were made. He testified that Connick contacted him and told him that boxes of evidence would be given to the district attorney's office by the attorneys for the Archdiocese, and Connick wanted him to review the materials to see if they contained evidence of any crimes. He testified that he discussed with Campbell the age of the males in the videotapes, as well as Cinel's wish to have the evidence returned to him. He testified that he never had the authority to decide whether to charge Cinel, and he never discussed the other possible charges against Cinel. He also admitted, however, that only he, Connick, and another investigator named Kessel were initially involved with the materials taken from Cinel. He admitted he probably told Campbell he was not concerned with the commercially-made items. However, he also testified that he did not even consider these items until after it had been established that the State could not prosecute Cinel on the videotapes.
Tolar admitted that by July or August, 1989, he and Connick had become satisfied that Cinel could not be prosecuted for the homemade videotapes. Tolar insisted that he suggested to Connick at that time that maybe Cinel could be prosecuted on the commercially-made materials, but Connick replied that "he wouldn't at that point in time."
Tolar testified that early in the investigation he had showed a videotape to Raymond, who had investigated a molestation case in St. Tammany Parish involving a priest, to see if Raymond recognized the youth involved. Raymond had kept the tape overnight, but he was unable to identify the youth. Tolar testified that after learning Fontaine's identity, he and Fontaine had met with representatives of the U.S. Postal Service and U.S. Customs concerning possible federal violations, and he had been in contact with the local U.S. Attorney's office. He stated that after the civil suit against Cinel and the Archdiocese had been filed, the district attorney's office received a subpoena duces tecum for the material seized from Cinel. In March, 1990, Paddison and Raymond obtained a "consent judgment" from the civil district court, in response to which these materials were turned over to Raymond.
Introduced at the hearing on the motion to quash was a memorandum from Tolar to Connick, dated February 22, 1990, wherein Tolar described taking "possession of several boxes of materials, most notably video tapes" from the Archdiocese. The memorandum states that the videotapes received involved "graphic sex acts with various individuals", two of whom were Fontaine and Tichenor. The memorandum notes that statements were taken from Fontaine in which he averred that he was at least seventeen years old when the videotapes were made. It also noted that Tichenor was "hostile and uncooperative." The memorandum ends with this sentence: "As a result of our investigation we determined that no violation of law occurred."
When questioned by the court about the meaning of the phrase "most notably video tapes" in this memorandum, Tolar explained that the last sentence referred only to the homemade videotapes, not to all of the materials seized from Cinel. He insisted that soon after this memorandum was written, he tried to persuade Connick to proceed with a child pornography charge against Cinel. However, there was no plan at that time to bring any charges against Cinel.
Harry Connick testified that Father Tarantino contacted him in December, 1988, to tell him that he had found the materials in Cinel's suite. He testified that when his office received the materials from the attorneys for the Archdiocese, they were directed to Tolar. He testified that he left the investigation in Tolar's hands, and at first Tolar did not tell him about the commercially-made materials, just the homemade videotapes. He testified that he and Tolar discussed the videotapes, the possible ages of the young men in them, and the problem of prescription with respect to the material. He insisted that he did not see most of the material seized from Cinel, having viewed only part of one videotape in Tolar's office.
*774 Connick also insisted that he had not given Tolar authority to negotiate with Campbell regarding the charges. He testified that after it became apparent that Cinel could not be prosecuted with respect to the homemade videotapes, he decided not to pursue any charges with respect to the commercially-made materials because he had earlier received a letter from the U.S. Attorney's Office noting that it had received a complaint about Cinel and asking to review the materials for possible federal violations. Connick testified that in light of this letter, he thought that federal charges would be brought against Cinel with respect to these commercial materials.
Connick testified that he asked Tolar to write the February 22, 1990 memorandum about the materials when his office received the subpoena from the civil district court to produce them. He testified that he was unaware of any negotiations between his office and the attorneys for the plaintiffs concerning the materials. He denied ever being advised by Tolar to institute charges against Cinel for possession of the commercial materials. Connick testified that it was not until after Raymond Bigelow and Tim McElroy of his office reviewed the case that anyone recommended that charges be instituted.
Connick testified that in August, 1990, he received a letter from Raymond complaining about the lack of prosecution of Cinel. Connick showed the letter to Tolar and told him to study the materials again to see if charges could be brought. He testified that investigative reporter Richard Angelico called him about the case much later, and at that time he admitted that he had no intention of prosecuting Cinel. When asked if in February, 1990, he had made a decision not to prosecute Cinel "for anything", he replied: "Yes". However, he then clarified his response by stating: "As long as you understand that the decision was a conditional decision." According to Connick, the decision was based on his expectation that Cinel would be prosecuted by federal authorities, making prosecution by his own office unnecessary and counterproductive.
Gary Raymond also appeared at the hearing. He testified that he first became involved in the case when Tolar asked him in 1989 to view a videotape to see if he recognized anyone. He viewed the tape, but he was unable to do so. He testified that late in the summer of 1989, he came upon Fontaine working on a boat owned by a mutual friend of his and Tolar's. He characterized this encounter as coincidental and fortuitous. He kept in contact with Fontaine and eventually directed him to Paddison. He later learned of Tichenor from Tolar and also directed him to Paddison.
Raymond testified that he had received the materials from the district attorney's office in March, 1990, and had made copies for Paddison, the attorneys for the Archdiocese, and eventually for the district attorney's office before turning the tapes over to federal authorities in 1991. He testified that when he learned that there would be no prosecution of Cinel, he wrote a letter to Connick complaining of the failure to prosecute. He claimed that this action was not done in furtherance of the lawsuit filed by Fontaine and Tichenor. Raymond testified that sometime after he sent the letter, Tolar called him and said that the State was reopening the investigation. Raymond also testified that sometime in April, 1991, he ran into reporter Angelico and invited him to his office to discuss the case. He testified that he gave Angelico portions of the videotapes made by Cinel as well as copies of a videotaped deposition given in the civil case. He testified that Angelico taped a report for Channel 6, but when Channel 6 refused to run the story, Raymond contacted a reporter for the Washington Times and gave him the story, and the story was then broken. He testified that he notified Angelico when he was to turn over the materials to the federal authorities, and Angelico filmed him delivering the materials.
The trial court granted the motion to quash the bill of information in this case, which involves the possession of commercially-made pornography involving juveniles, because it found that the State had promised that Cinel would not be prosecuted *775 on any of the materials seized from the rectory if he could prove that the males involved in the homemade videotapes were not juveniles when the tapes were made. The State argues that this ruling was erroneous for three reasons: (1) Tolar did not have the authority to make any such promise; (2) even assuming Tolar had apparent authority, he made no agreement not to prosecute Cinel on the commercial materials; and (3) even if some sort of immunity was offered, it could not apply to the charge on the commercial materials because the evidence supplied by Cinel was not related to the commercially-made videotapes, but only to the homemade videotapes.
We first address the issue of Tolar's authority to act on behalf of the district attorney's office.

Tolar's Authority to Make An Agreement
With respect to this issue, the State argues that according to Louisiana Code of Criminal Procedure article 61, "the district attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute." Article 8 of the same Code confers this power upon assistant district attorneys also. In addition, the only Louisiana statute specifically granting any type of immunity (use immunity), is Code of Criminal Procedure article 439.1, which requires the agreement of the district attorney or the attorney general. Therefore, the State asserts that Tolar, a police officer serving as an investigator for the district attorney's office, did not have the authority to enter into an agreement with Cinel's attorney Campbell concerning the institution of any charges against the defendant.
The defense does not dispute the fact that Tolar had no actual authority to make a deal, but rather argues that Tolar had apparent authority, which makes his alleged agreement with Campbell binding on the State. In support of its argument, the defense cites various cases involving plea bargain agreements.
In State v. Tanner, 425 So.2d 760 (La. 1983), the defendant was charged by bill of information in connection with a death arising from an automobile accident. The assistant district attorney in charge of the case told the defendant that if he and his witness testified before the grand jury and the grand jury chose not to indict him, the bill of information filed against him would be nolle prosequied. The defendant and his witnesses agreed and testified before the grand jury, which returned a no true bill. However, the assistant district attorney refused to nolle prosequi the case, and the defendant moved to quash the bill. The assistant district attorney denied making the promise, but also admitted that the defendant's attorney probably thought that he had. On review of the trial court's refusal to quash the charge, the Court acknowledged that the district attorney under Code of Criminal Procedure Article 61 has the sole control over the charging and prosecution of a case, and that generally the action of the grand jury is not binding on the district attorney. However, the Court found that the assistant district attorney's promise to the defendant to drop the charges, in exchange for his testimony before the grand jury, bound the district attorney's office to the promise not to prosecute the defendant once the grand jury returned a no true bill. The court spoke of the difference between use immunity and transactional immunity, and it noted that the State could have compelled the defendant to appear before the grand jury to testify, but any statements he made would not have been admissible against him (use immunity). However, by entering into the agreement with the defendant, the assistant district attorney was promising transactional immunity. The Court noted: "When a district attorney or assistant district attorney makes a good faith bargain with a person accused of a crime and defendant, in reliance on that bargain, relinquishes such a fundamental right as the privilege against self-incrimination, the State cannot repudiate the bargain." Id. at 763. The Court held that absent any prosecution for making false statements or perjury before the grand jury, the defendant *776 was granted transactional immunity when the grand jury did not indict him.
Likewise, in State v. Bentley, 499 So.2d 581 (La.App. 2nd Cir.1986), writ den. 503 So.2d 477 (1987), the defendant was arrested on state charges, and an assistant district attorney directed the defendant to federal authorities, promising that if the defendant was charged in federal court and agreed to give information about other suspects, state charges would not be filed. The defendant complied with the agreement and subsequently pled guilty to federal charges. A new district attorney, who had not been in office when the agreement was made, indicted the defendant. On review, the Second Circuit ruled that the State was bound by the agreement reached with the former assistant district attorney, even though the agreement was not in writing. The court found that the defense attorney and the federal authorities:
gained the subjective understanding from conversations they separately had with [the assistant district attorney] ... that the State agreed not to prosecute if Bentley fulfilled to his plea bargain with the federal government. Bentley incriminated himself and pleaded guilty, relying on the verbal representations and agreement that were made by the State, through its assistant district attorney, to his lawyer and to [federal authorities]. We find Bentley's reliance eminently reasonable.
Id. at 585. Finding that prosecution of the defendant would violate fundamental fairness, the court quashed the indictment.
In State v. Lehrmann, 532 So.2d 802 (La.App. 4th Cir.1988), writ den. 533 So.2d 364 (1988), the defendant was a restaurant owner who had paid money to Eastwold, a city finance worker, in return for which Eastwold falsely calculated the defendant's tax liability to the city. Eastwold had testified before the state grand jury concerning other tax irregularities, but the defendant had not been mentioned by him. Federal authorities, also investigating tax irregularities, contacted the defendant, who agreed to testify before the grand jury and to wear a radio transmitter to record Eastwold admitting his part in the tax fraud, in exchange for which the defendant was given transactional immunity from federal prosecution. Eastwold eventually signed his own immunity agreement with federal authorities, but he soon breached the agreement by telling other city officials about the investigation. Just before Eastwold was to turn himself in to federal authorities and just before the defendant was to testify before the federal grand jury, Eastwold approached the Orleans Parish district attorney's office and entered into an immunity agreement with the district attorney which implicated the defendant. Eastwold's testimony before the state grand jury resulted in an indictment against the defendant.
On review of the trial court's refusal to quash the indictment, the defendant argued that the state charges against him should have been quashed because they arose from information he had given to federal authorities in return for a use-immunity agreement with them, and thus the state charges were a violation of his Fifth Amendment rights. This court agreed, finding that Eastwold's testimony to the state grand jury was a direct result of the defendant's statements made to federal authorities in connection with his immunity agreement. This court stated: "The prohibition against the use of compelled testimony includes its utilization as an investigatory lead and `use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosure.' Kastigar [v. United States ], 406 U.S. [441] at 460, 92 S.Ct. [1653] at 1665 [32 L.Ed.2d 212] [ (1972) ]." Lehrmann at 806. This court noted that the State had the burden of proving that the charges against the defendant arose from an independent source in order not to violate the defendant's immunity agreement, and the State had failed to do so.
In State v. Lewis, 539 So.2d 1199 (La. 1989), the defendant agreed to give information to the district attorney in Rapides Parish in exchange for that district attorney's agreement to charge him with only one count and to not use against him the information he gave. Part of the agreement *777 included the defendant also giving information to federal authorities concerning an arson investigation, which he ultimately failed to do. However, some of the information given to the Rapides district attorney involved state crimes committed in Avoyelles Parish for which the defendant was ultimately charged. The defendant sought to suppress the use of any statements he made in connection with his agreement with the Rapides Parish district attorney, and the trial court denied the motion.
On review, the Court ruled that while the agreement did not bar the filing of charges in Avoyelles Parish,[2] any statements made in connection with the defendant's agreement with the Rapides Parish district attorney must be suppressed because they were given under an agreement of use immunity. In so finding, the Court likened the agreement to a contract, citing State v. Nall, 379 So.2d 731 (La.1980), where similar reasoning was applied to a plea bargain agreement.[3] The Court noted that because both parties did not get what they had bargained for, the agreement should be dissolved. However, the Court further found that because the defendant's statements were made in anticipation of the agreement, they could not be viewed as having been voluntarily given, and as such they could not be used against him in the Avoyelles prosecution.
The key distinguishing factor between the above cases cited by the defendant and the instant case is that in the instant case, the alleged promise not to prosecute Cinel was made by a police officer investigating the case for the district attorney's office, not by the district attorney, an assistant district attorney, or even a staff lawyer in the district attorney's office. All four cases relied upon by the defendant involve an agreement made by the district attorney or an assistant district attorney. Moreover, of the four cases, only Tanner and Bentley are relevant because they deal with transactional immunity. By contrast, Lehrmann and Lewis concern use immunity, which is not applicable to the instant case because Cinel did not give up any information which could be used against him; rather, he gave the State exculpating information about the age of the parties seen in the videotapes.
We have located no Louisiana cases in which the court has found "apparent authority" to exist on the part of someone associated with the district attorney's office who is not an attorney. In support of its argument that the law does not contemplate such apparent authority, the State cites State v. Howard, 448 So.2d 150 (La. App. 1st Cir.1984), writ den., 449 So.2d 1355 (1984), wherein the defendant gave information to a police officer which led to arrests. The defendant contended that she was led to believe that if she gave this information, she would receive a certain sentence and favorable consideration would be given to her husband and brother. However, because the defendant refused to identify her drug supplier, the district attorney refused to concur in the agreement. On review, the First Circuit declined to enforce the agreement, holding that "[t]he district attorney is the only official vested in law to engage in plea bargains." Id. at 155.
Defendant argues strenuously that Howard is distinguishable because the police officer involved was not an investigator for the district attorney's office, as was Tolar. Even considering this fact, however, there is absolutely no indication in either the statutory law or the jurisprudence that the district attorney's office may be bound by the words or actions of a police officer, or of any other non-attorney employee of the *778 office. In the absence of any legal basis, we decline to extend the doctrine of apparent authority so far. Moreover, such an extension of the law would not be warranted under the facts of this case because Campbell, who had worked in the district attorney's office, knew that only assistant district attorneys were authorized to make deals. Based on this special knowledge, as well as the general precept that attorneys are charged with knowing the law, Campbell should have questioned Tolar's authority to make a binding promise. We therefore hold that Tolar did not have the requisite authority, apparent or otherwise, to make an agreement not to prosecute Cinel.
Because we find that Tolar lacked the authority to bind the district attorney's office, it is unnecessary for us to consider defendant's remaining two arguments concerning whether Tolar actually made an agreement and the scope of that agreement. Accordingly, for the reasons stated, we reverse the judgment of the trial court which quashed the bill of information, and we remand the matter to the trial court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
BYRNES, J., dissents with reasons.
BYRNES, Judge, dissenting with reasons.
I respectfully dissent. The unusual and compelling facts of this case are such that I must agree with the decision of the trial judge. The defendant was led to believe that either George Tolar had the authority to make an agreement, or that he had the authority to communicate an agreement made by those in the District Attorney's Office who had the authority to make such an agreement. Tolar was employed by the Orleans Parish District Attorney's Office and had been given the task of reviewing the materials seized from the defendant to see if they contained possible violations of the law. As noted by the defendant, the handling of this case was unusual. The defendant was never arrested prior to the filing of charges in 1991. Defendant's attorney at that time, William Campbell, spoke with the District Attorney's Office on at least two occasions concerning the return of the materials to Cinel, and both times the District Attorney directed him to Tolar. In addition, Campbell testified that on many occasions in the spring of 1989 he tried to contact any Assistant District Attorney involved with the case, and each time he was told that there was no Assistant District Attorney assigned to the case and that the only person to whom he could speak was Tolar. Although Tolar may not have had actual authority to enter into an agreement, such actions by the District Attorney's Office supplied Tolar with the apparent authority to do so, or in the alternative clothed him in the appearance of one who was relaying the duly authorized decisions of those in the office who had the requisite authority to make such decisions.
There are no Louisiana cases dealing with the issue of "apparent authority" on the part of an employee assigned to the district attorney's office who is not an attorney. In United States v. Herman, 544 F.2d 791 (5 Cir.1977), the Fifth Circuit considered a Florida case in which the defendant was arrested for committing a murder during a robbery of a post office. While in the presence of postal inspectors, the defendant stated that his partner had fired the fatal shot, and he offered to testify against his partner and produce the gun if the government would allow him to plead guilty to a robbery charge and not charge him with the murder. The officers had no authority to enter into an agreement, and the defendant was charged with robbery and murder. The trial court suppressed his statements made to the postal inspectors, and the State appealed. The Fifth Circuit affirmed, finding that the statements were made in furtherance of what the defendant believed was a plea agreement, and thus they were not freely and voluntarily given. The government argued that there could have been no plea agreement because the postal inspectors were not authorized to enter into any plea agreement. The Fifth Circuit rejected this contention, noting:
The relevant factor is a defendant's perception of the government official's negotiating *779 authority, not the official's actual authority. The twin goals of encouraging unrestrained plea negotiations and assuring fairness to defendants dictate that any statements made by a defendant as part of an effort to reach a plea agreement must be excluded; it makes no difference that the defendant's efforts are misguided because the official cannot or will not accept the offer. Id. at 798.
The court also rejected the government's argument that the defendant could not have possibly believed that the postal inspectors had the authority to bargain, finding that under the circumstances the defendant was justified in believing that the inspectors could negotiate the agreement. The court so found, even in the face of one inspector's statement that he was "not in position" to make any deals, which the court found to be a not unusual disclaimer, because the inspector did not tell the defendant that he would have to deal with the prosecutor. The court noted: "The postal inspectors had all the trappings of officialdom, and they should not now be permitted to use those trappings to trap the accused." Id. at 799.[1]
Herman was decided prior to the 1979 amendment to Rule 11(e)(6)(D) which inserted the requirement that the discussion be made with an attorney for the government. The Fifth Circuit noted this change in the Rule in United States v. Keith, 764 F.2d 263 (5th Cir.1985). While holding that the defendant's statements were not protected under Rule 11(e)(6) because the officers told him that they could only recommend leniency, the Court also envisioned a situation where implied authority might still exist:
Nor do the circumstances above recounted fall within any exceptional situation that might make plea negotiations with other than an attorney inadmissible, where due for instance to governmental misrepresentations, the accused "exhibited an actual subjective expectation to negotiate a plea at the time of the discussion" and the "expectation was reasonable, given the totality of objective circumstances." United States v. Robertson, 582 F.2d 1356, 1366 (5th Cir.1978) (en banc); United States v. Posey, 611 F.2d 1389, 1390 (5th Cir.1980). Keith, 764 F.2d 263, 266 (emphasis supplied).
Thus, even though Federal Rule 11(e)(6) requires that a plea agreement be made with a government attorney, the Fifth Circuit acknowledges the possibility that a law enforcement agent could be cloaked with the apparent authority to enter into a binding plea agreement.[2]
Louisiana law does not contain a statutory provision for the granting of transactional immunity. Therefore, there is no impediment to applying the principles set forth in Howard, which considered Rule 11(e)(6) prior to the amendment which added the requirement that plea negotiations be made with a government attorney where the facts are compelling.
The State argues that because Campbell worked for the District Attorney's Office, he should have known that Tolar did not have the authority to promise that Cinel would not be prosecuted. However, because Campbell was acquainted with the District Attorney's Office he knew that the case was not taking the normal route of cases in the office, and that the District Attorney's Office repeated insistence that Campbell see Tolar about the case, along with Campbell's inability to find any Assistant District Attorney dealing with the case, reinforced his belief that Tolar had the authority to communicate for the office even if he did not personally possess decision making authority. The State notes that Campbell admitted that Tolar told him that he could not sign an agreement concerning the deal, but Campbell repeatedly insisted that he would not have provided *780 Fontaine's and Tichenor's names and affidavits if he thought Tolar did not have the authority to enter into the immunity deal.

The Agreement Between Campbell and Tolar
Assuming that Tolar had apparent authority to make or communicate an immunity agreement with Campbell, the next issue which must be addressed is whether the evidence supports the trial court's finding that such an agreement was made or communicated. The State argues that there was no agreement. It cites to the testimony of Tolar, who emphatically denied making any promise to Campbell that Cinel would not be prosecuted for anything if he identified the males in the homemade videotapes. However, Campbell just as emphatically affirmed that such promises were made to him by Tolar. The trial judge believed Campbell. This is the kind of credibility determination that the trial judge who has the benefit of observing the demeanor of live witnesses is in a better position to make than is this court. State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir. 1989).
Even if Cinel did not have the apparent authority to make an agreement with Campbell, the record supports the conclusion that Campbell could reasonably assume that Tolar was acting as the duly authorized spokesperson for the District Attorney or an Assistant District Attorney who had the requisite decision making authority. In other words, because of the way this case was handled by the District Attorney's office, Campbell was induced to believe that regarding this particular case either Mr. Tolar had decision making authority, or he was the designated conduit for information and decisions of those who had decision making authority.
In order to support its claim that no agreement was made, the State cites to Campbell's notes of August 21, 1989, which were produced for the hearing and referred to in testimony, but which were not actually introduced into evidence. Campbell's notations for that day state: "[Tolar] indicated to me on the phone that he was of the impression or opinion that he would probably not recommend prosecution for these offenses, but he did not guarantee it. That resulted this time." Although the State argues that this notation, which was "virtually the last conversation Campbell had with Tolar", shows that there was no promise made that Cinel would not be prosecuted, at best it shows only that Tolar agreed not to recommend prosecution. Moreover, Campbell testified that his notes stated that he was to contact Tolar again after Labor Day, and when he did so, possibly on September 12th, Tolar told him that Cinel would not be charged. Again, this court should not disturb the finding of the trial court unless it is clearly contrary to the evidence which is not the case on this issue. State v. Cashen, supra.
The State next contends that there was no agreement not to prosecute Cinel for anything involving the material seized from him because the subject of possession of child pornography never arose between Campbell and Tolar. However, Campbell testified that he and Tolar generally talked about the contents of all of the materials, including the commercially-made materials involving child pornography. He also testified that Tolar repeatedly told him that the State was not interested in the commercially made materials. This is believable because of the difficulty of establishing the identity and age of individuals in the commercially made pornography were underage. This court should defer to the trial judge on this issue.
There was an agreement between Campbell and Tolar. Since the defense complied with its part of the agreement, the State was bound by Tolar's promise. Cinel did not have to cooperate with the State at all. Tolar admitted that if Cinel had not supplied the identities of Fontaine and Tichenor, the videotapes "would have been an unsolved issue." Campbell's testified that he "would not have gone forward without that assurance, without that belief that I could reduce the case to no charge with this effort, if it proved to be true.... Otherwise, I wouldn't have gone forward." Thus, Cinel waived his right to have the State prove its case on its own, believing *781 that such action would shield him from prosecution on anything arising from all the materials.
There are many indications, besides the testimony of Campbell, which circumstantially show an intent not to prosecute Cinel in connection with the commercially-made materials. The defense performed its part of the agreement, and a decision was made in 1989 not to prosecute Cinel. No charges were filed for almost two years, until May 1991 when news stories about the materials found at St. Rita's were printed and then broadcast. In March 1990, some months after the alleged agreement between Campbell and Tolar, the District Attorney's Office gave all of the materials to a private investigator Gary Raymond for the civil case, not just the homemade videotapes but also the materials which form the basis of this case. In addition, a copy of the State's file was given to Fontaine's attorney.[3]
The District Attorney testified that he did not file charges against Cinel because he thought Cinel would be charged by federal authorities with the commercially-made materials. However, the District Attorney admitted he never talked with any federal prosecutors concerning the case, and his office never delivered any of the materials to federal authorities. In addition, the defense cites to the tape of an interview the District Attorney gave to the news reporter Richard Angelico wherein he admitted that an "absolute consideration" in his decision not to prosecute was his intent to spare the Church from embarrassment. Father Tarantino's testimony reveals that he was told by the District Attorney that if it was found that the males were adults, the only thing which Cinel could be prosecuted on with respect to the videotapes would be crime against nature, for which he would not prosecute Cinel. The attorneys for the Archdiocese sent a letter to the District Attorney indicating that it was not interested in seeing Cinel prosecuted. All of this evidence supports the conclusion of the trial court.
The testimony of Tolar and the District Attorney are inconsistent as to whether Tolar advised the District Attorney that Cinel could be prosecuted with respect to the commercially-made materials. Tolar insisted that from September 1989, when he advised the District Attorney that Cinel could not be prosecuted for the homemade videotapes, he advised the District Attorney to charge Cinel in connection with the commercially-made materials. However, the District Attorney denied that Tolar so advised him, stating that for a long time he was unaware of exactly what was included in the materials sent by the Archdiocese, and that it was not until much later that he became aware that Cinel could be charged with other crimes.
Tolar sent the District Attorney a memorandum dated February 22, 1990 which concluded that: "As a result of our investigation we determined that no violation of law occurred." This supports the District Attorney's version of what was told to him.
In the same memorandum, Tolar informed the District Attorney that he had taken "possession of several boxes of material, most notably video tapes" from the attorney for the Archdiocese.
When questioned by the court about the meaning of the phrase "most notably video tapes" in this memorandum, Tolar explained that the phrase meant "only videotapes" and not other materials seized from Cinel. Therefore, the reference at the end of the memorandum to "no violation of law" was intended to refer only to the videotapes. The skepticism of the trial court at this strained interpretation is apparent in the record. If the trial court elected not to be persuaded by Mr. Tolar's explanation, preferring instead to attribute a more normal construction to the language in the memo it was not an abuse of discretion. Tolar insisted that soon after this memorandum was written, he tried to persuade Connick to proceed with a child *782 pornography charge against Cinel. However, there was no plan at that time to bring any charges against Cinel. The record supports the trial judge's view of these facts. State v. Cashen, supra.
The District Attorney believed that Cinel would be prosecuted by federal authorities. This supports the defense argument that he granted transactional immunity for State purposes believing that Cinel could still be prosecuted even if given immunity from State charges.
Resolving conflicting testimony is a credibility determination. The trier of fact has great discretion in its determination of the credibility of witnesses, and such determination should not be disturbed unless such finding is clearly contrary to the evidence. State v. Cashen, 544 So.2d 1268 (La.App. 4th Cir.1989). Given the facts set forth above, the trial court did not abuse its discretion by finding that Campbell was more believable than Tolar; by finding that a transactional immunity agreement had been communicated by Tolar to Campbell to which Campbell agreed; by finding that the agreement was then acted on by the defendant; and by finding that Campbell and the defendant were reasonable in so doing.

The Extent of the Immunity
The State lastly contends that even if this court finds that a transactional immunity agreement was made between Campbell and Tolar, the agreement did not extend to the commercially-made videotapes because the information given by Cinel related only to the homemade videotapes. In addition, the State argues that there really could not have been a transactional immunity agreement because the information supplied by Cinel did not incriminate him, but rather it exculpated him.
The information supplied by the defendant in Rowe v. Griffin, 676 F.2d 524 (11 Cir.1982) exculpated himself and incriminated a third party. Thus, it does not appear that the information supplied by a defendant in connection with a transactional immunity agreement must necessarily be self-incriminating. In addition, as noted above Cinel was under no obligation to help the State find the males in the videotapes, and without his help the males may never have been found. Also, by providing Fontaine's and Tichenor's identities, Cinel supplied evidence of possible crime against nature charges. Although the District Attorney testified that he never intended to try Cinel on that charge, this evidence was nonetheless incriminating.
Just as the District Attorney changed his mind about pursuing the defendant on the charges that are the subject of his appeal, he could just as easily have decided to bring charges against the defendant for crime against nature. The materials were all seized together. If Cinel had been unable to show that the males in the videotapes were not juveniles, it is possible the State could have tried to prosecute him for possession of child pornography with respect to the videotapes as well as the commercially-made materials. If so, the homemade videotapes would have comprised a part of the materials included in a single charge of possession of child pornography, another part of which was the commercially-made materials. The State was unable to try Cinel on separate counts of possession for each item of child pornography, the bill so charging him having been quashed by the trial court.[4] The court would not have been able to charge him in one count for the possession of the commercially-made materials and in another count for the possession of the homemade videotapes because his possession of both types of items comprised one count of possession of child pornography. The homemade videotapes and the commercially-made materials were all part of a larger group consisting of all the materials seized from Cinel, and as such the immunity agreement would cover the commercially-made tapes.
Even more compelling is the fact that the agreement of transactional immunity extended to the commercially-made videotapes *783 because the promise not to prosecute conveyed by Tolar included a promise not to prosecute Cinel with respect to any of the materials seized from Cinel. The trial court found that the State agreed not to prosecute Cinel for anything in connection with any of the materials seized from Cinel. Viewed in this light, transactional immunity would extend to the commercially-made materials because they formed a part of the agreement between Campbell and Cinel. As such, this promise would still be binding even though the information given by Cinel did not include information concerning the commercially-made materials. The defendant reasonably believed and relied upon what he thought was an agreement that would dispose of charges related to all of the materials in exchange for information relating to the participants in the homemade videotapes. The trial court found that the agreement encompassed all of the materials, both commercially-made and homemade. Thus, by its very terms the transactional immunity agreement included prosecution for possession of the commercially-made materials.
Once again there is abundant evidence in the record to support the findings of the trial court. Therefore, we find that the trial court made no errors of fact. State v. Cashen, supra.
As the trial court made no errors of fact or law the decision of the trial court should be affirmed.
NOTES
[1] Cinel was charged in another case with a sixty-count bill of information charging him with each individual piece of pornography which comprised the one count in this case. That bill of information was quashed on October 26, 1991, and the State agreed not to appeal that decision.
[2] The Court found that a district attorney of one parish could not bar the district attorney of another parish from bringing charges for crimes committed in that parish.
[3] Nall involved a case where a defendant agreed to plead guilty to a lesser offense in exchange for testimony implicating his codefendant. However, at his codefendant's trial his testimony implicated only himself. The Court found that because the plea bargain agreement had been breached, the State could withdraw from the agreement. The Court further found, however, that any statements the defendant made in connection with the agreement could not be used against him.
[1] Herman cited similar instances in United States v. Ross, 493 F.2d 771 (5th Cir.1974); and United States v. Smith, 525 F.2d 1017 (10th Cir.1975).
[2] United States v. Grant, 622 F.2d 308 (8th Cir. 1980), cited by the State, is not really applicable to this case because in that case the F.B.I. agent told the defendant that he had no authority to enter into any plea agreements, but the defendant continued giving him information.
[3] The record raises serious questions that are beyond the scope of this opinion about the extent to which the defendant may have been prejudiced by the unusual and unorthodox manner in which information in the District Attorney's Office found its way into the civil liability suits involving the defendant.
[4] The multi-count bill of information was quashed the same day the count in this case was quashed, and the State noted its intent at that time not to appeal that ruling.