632 So.2d 351 (1993)
STATE of Louisiana
v.
Willie WILLIAMS,[1] a/k/a Butch Williams.
No. 93 KA 0353.
Court of Appeal of Louisiana, First Circuit.
December 29, 1993.
Rehearing Denied March 21, 1994.
*352 Doug Moreau, Dist. Atty., Office of Dist. Atty., Baton Rouge by Sue Bernie, Asst. Dist. Atty., for the State of La., appellee.
Stephen Street, Baton Rouge, for defendant-appellant.
Before WATKINS, SHORTESS and FOGG, JJ.
FOGG, Judge.
Defendant, Willie Williams, Jr., (a/k/a Butch Williams) was charged by a single indictment consisting of three counts: (count one) aggravated rape, (count two) aggravated burglary and (count three) aggravated crime against nature, violations of LSA-R.S. 14:42, 60 and 89.1, respectively. Defendant was tried by a jury, which convicted him as charged on all three counts. Subsequently, the trial court sentenced defendant to terms of imprisonment at hard labor as follows. For the aggravated rape, defendant was sentenced to imprisonment for his natural life.[2] For the aggravated burglary, the court imposed a sentence of thirty years; for the aggravated crime against nature, defendant received a sentence of fifteen years without benefit of parole, probation or suspension of sentence. The court ordered that the sentence on count three run consecutively to the sentence on count two, that the sentences on counts two and three run concurrently with the sentence on count one, and that defendant receive credit for time served. Defendant has appealed, urging nine assignments of error:

*353 1. The jury's verdicts are contrary to the law and evidence.
2. The trial court erred in denying defendant's motion for new trial.
3. "The statute(s) under which defendant's aggravated rape conviction was obtained are unconstitutional under both the Louisiana and United States Constitutions, in that when the Louisiana legislature amended the rape statute(s) to remove spousal immunity, it failed to remove spousal immunity from La.R.S. 14:43 (the simple rape statute) or La. R.S. 14:43.1 (the sexual battery statute) even though La.C.Cr.P. art. 814 continues to list both offenses as responsive verdicts to aggravated rape. As it is legally impossible for defendant to have committed either of those offenses against his wife, the jury was unable to legally consider these lesser included offenses during deliberation; defendant was therefore deprived of his constitutional right to a fair trial."
4. The trial court erred in failing to instruct the jury as to all the responsive verdicts to aggravated rape as listed in LSA-R.S. C.Cr.P. art. 814.
5. The trial court erred in denying defendant's motion for mistrial, made after Officer Kyle Garrison referred to a previous arrest of defendant in the presence of the jury.
6. With respect to the aggravated burglary conviction, the trial court erred in failing to instruct the jury regarding the issue of whether a person can be legally guilty of burglarizing his or her own home/family dwelling.
7. Defendant was denied a fair trial on the basis that he received ineffective assistance of counsel at trial, in violation of the Sixth Amendment to the United States Constitution and Article I, Section 13 of the Louisiana Constitution.
8. The state made comments during opening and closing arguments which were improper and prejudicial to defendant and thus denied him a fair trial.[3]
Assignments of error not briefed by a defendant on appeal are considered abandoned. Uniform Rules-Courts of Appeal, Rule 2-12.4. In brief, defendant merely restates the wording of assignment of error number six. Restatement of an assignment of error in brief is nothing more than a listing of the assignment and certainly does not constitute briefing of the assignment. No argument is made and no authorities are cited. Therefore, this assignment is deemed abandoned. See State v. Frelix, 484 So.2d 936 (La.App. 1st Cir.1986).
The record reflects that the instant offenses occurred in Baton Rouge, on July 22, 1991. Defendant's wife was the victim of the offenses. Defendant and the victim had married on August 4, 1984. They had two small boys, ages seven and two. On May 25, 1991, defendant had moved out of the family residence and had given the victim the keys to the home, telling her that he was not coming back. Thereafter, the victim did not seek a reconciliation with defendant and made it known to him that she did not want him to return to the residence. Nevertheless, defendant (who drove a green and white jeep) continued to come to the location. He did so on numerous occasions; as a result, the victim would call the police. Each time she contacted the police, defendant would leave the premises before they arrived.
On July 22, 1991, a concerned citizen made an emergency 911 telephone call reporting that the victim's husband (who was driving a green jeep) had just jumped the fence and pulled the telephone wires away from the victim's residence. The caller indicated that she could hear the victim screaming inside the house and that she was concerned for the victim's safety.
*354 Thereafter, at about 10:30 p.m., Baton Rouge Police Officers Kyle Garrison and Mark A. Martello received a call in regard to the disturbance at the victim's residence. Both officers had gone twice to the residence earlier that day in response to complaints by the victim concerning defendant, and Garrison had been to the residence approximately twelve times in reference to the victim's previous complaints relating to defendant's harassing her and trying to force his way into the home. Upon their arrival at the residence for the third time that day, they went to the front door. Garrison knocked on the front door. Martello went to the carport and positioned himself at a door under the carport. When Garrison knocked on the door, the den light went out, country music which had been playing inside the house went off, and someone moved the blinds and looked at Garrison. Garrison could not see who this person was, and the person did not identify himself. At that point, Martello contacted Garrison and advised him that he had heard someone running through the house and had heard screams for help. Garrison then went to Martello's location beneath the carport. The police made a decision to enter the residence on the basis that someone inside the residence was in danger, and they forcibly entered the home through the door where Martello had stationed himself.
The officers found defendant, who was nude, coming from the rear, bedroom area of the house. They advised defendant to lie down on the floor. When he failed to comply, the officers placed defendant down on the floor. At that point, the victim (who was also nude) came running from the back of the house, crying and in a hysterical state, screaming that defendant had beaten and raped her and had killed the family's cat. Defendant was placed under arrest and advised of his constitutional rights.[4]

ASSIGNMENT OF ERROR NUMBER ONE
By means of this assignment, defendant contends that the evidence is insufficient to support the jury's verdicts on all three counts, i.e., aggravated rape, aggravated burglary and aggravated crime against nature.
In reviewing claims challenging the sufficiency of the evidence, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). See also LSA-C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305 (La.1988).
The victim testified that, at the time she married defendant, she was living at the same residence where the offenses occurred and that it is her separate property. She stated that she paid for the residence and was responsible for its upkeep.
According to the victim, after defendant moved out of the residence and relinquished the house keys to her on May 25, she had contact with him on June 9. On June 9 and thereafter, every time she spoke to defendant she made it known to him that she did not want him to come to her home. On the numerous occasions when defendant would come to her home, she would call the police; when the officers arrived, defendant had already left the premises.
The victim's testimony reflects that she did not seek, nor was there ever, a reconciliation with defendant after his May 25 departure and announcement that he would not return. However, on July 19, three days prior to the instant offenses, defendant came to the victim's house, entered the home with a key, and forced her to have sex with him during the early morning hours of July 20. After the incident, the victim had the locks on the doors to her home changed, having discovered that defendant still had a key to the house.
During the night after the victim had her locks changed, defendant came back to her house and unsuccessfully tried to use his key to gain entrance to the house. The victim called the police. Sergeant Michael R. Morris came to investigate her complaint. Defendant *355 had left, but the victim was adamant in stating to the officer that she did not want defendant on her property. Feeling that defendant would be back, the victim did not sleep that night.
During the day on July 22, the day the instant offenses occurred, the victim filled out the necessary information for a petition for a temporary restraining order to bar defendant from reentering her premises. She was given the name of an individual who apparently would be the attorney representing her in court on the matter. Later, when the victim got home from work, defendant was the first person to call her. Because she thought it might keep defendant away from her home, she told defendant (during this telephone call) that she was pursuing the restraining order.
After the telephone call, defendant came to the victim's home, opened the gate to her yard, letting her dogs get loose. Defendant also stole the lock that had been used to secure the gate. The victim again called the police.
Defendant again telephoned the victim. He told her that he had acted rashly and wanted to return the lock, which he had locked around the steering wheel of his jeep. The victim surmised that defendant was using the lock as a ploy to get her to let him in her house. Consequently, she told defendant that she would not open the door to her house but would give him the key to the lock (which he was returning) through the mail slot so that he could open the lock which was around his steering wheel and return it to her. This procedure was followed; thereafter, defendant left the premises.
Later, at about 10:00 p.m., while the victim and her two children were watching television, she heard a noise that sounded like her screens were being ripped off one of her windows. She jumped up to see what it was and saw that defendant was already inside her house. He had "crashed through" the door under her carport. She tried to use the telephone to call the police but realized that it was "dead."
Defendant approached the victim. The children were with her. She initially told defendant to calm down and try to talk, but defendant had an "unusual look" on his face. Before she could do anything, defendant began beating the victim with his fist "as hard as he could" about the face and head. The victim was wearing only a nightgown and managed to crawl back into the bedroom, where the children were, while defendant was kicking her. The victim testified that she recalled defendant's asking her where was her restraining order, where was the individual who was to assist her in obtaining the order, and whether this individual was helping her now.
Defendant stripped his clothes off at the entrance to the victim's bedroom. Defendant then yanked the victim up by the hair of her head and forced her to have oral sex with him in front of the children. Defendant told the victim that "she better make his penis erect." The children were still on the bed at the time. However, at one point, defendant "snapped to reality" and dragged the children into their room and flung them on their bed, telling them not to move.
Defendant came back into the victim's bedroom and yanked her up from the floor by the hair on her head. He threw her on the bed. When she got up to resist, he ripped off her nightgown. Defendant then knocked her down on the bed, forced her legs apart, thrust himself against her, and "just jabbed his penis into [her] vagina." Defendant was unable to maintain an erection for very long, but he did penetrate her twice. At that point, defendant became even more frustrated and violent.
Defendant grabbed the victim by the hair of her head again and told her she had to perform oral sex on him and make his penis stay erect. He threatened to kill her if she could not make it stay erect. Defendant also made the victim perform anal sex with him orally. The victim felt dirty after this sexual activity and begged defendant to let her go to the bathroom to get cleaned up.
At this point, the children were still in their room on the bed. Defendant dragged the victim by the hair to the bathroom and told her that she needed to get cleaned up. The victim began drawing water in the bathtub, while trying to wash some blood from *356 her body and rinse her mouth. Defendant went to the refrigerator to get a gallon of milk. At that time, the victim tried to gradually unlock the window so she could raise it and scream, but defendant caught her trying to unlatch the window. He then got "real violent" and kicked her down in the tub. Defendant banged the victim's head against the bathtub and ceramic tile by kicking her with his feet. Defendant had the container of milk in his hands and was letting milk run down his face and chest, slinging milk all over the bathroom. Defendant dared the victim to say anything about what he was doing with the milk. In the past, he and the victim had had disagreements because defendant would drink all of the baby's milk, leaving the victim with no milk to fix the baby a bottle.
Defendant made the victim perform oral sex on him again. This time he told her that she better do it until he climaxed in her mouth or he was going to kill her. She believed him. Following this episode of oral sex, the victim proceeded to put her clothes on because defendant had told her while they were in the bathroom that she, and the children were going on a trip that night. However, defendant refused to allow the victim to get dressed. He told her that she would have to give the children some Benadryl so he could "put them out for the night and have [his] way with [her] for the night."
Defendant grabbed the victim by the arm and dragged her into her bedroom. He left her momentarily to go get the medicine. The victim decided to get into the closet to try to get her gun. Defendant realized what she was trying to do and started beating her again. Defendant then beat her because he wanted her to produce the gun. She refused to produce it and told defendant that she was in the closet looking for something to put on. The victim successfully made defendant believe that there really was no gun in the closet. Defendant still kicked her and beat her, while holding the medicine in his hand. Defendant gave the victim the medicine and told her to take it in the next room and administer it to the children. Defendant followed her. The victim saw the horrified looks on the children's faces and gave them the medicine which was actually "Equate" rather than Benadryl. In administering the drug, she gave them the least amount of it as she could while mindful that she still had to make defendant think that she was complying with his demands. While giving the drug to the younger child, the victim tried in a low voice to tell the older child to run for help. However, defendant overheard her and announced that the older child was not going anywhere. The victim handed the medicine back to defendant, and he walked into the living room and turned the stereo on very loud.
Defendant came back with the family's pet cat, which had been in the living room. Defendant began twisting the cat's neck, apparently trying to break the cat's neck. The victim started screaming "like [she had] never screamed before." The cat was gasping for breath. Its tongue was hanging out. The children were watching in horror, as was the victim. The victim pleaded with defendant to let the cat go, telling him that she would do anything and asking that he please not hurt the cat. Defendant went back into the kitchen with the cat and returned with the cat and a steak knife. Defendant started repeatedly stabbing the cat with the knife. The victim was hysterical. Defendant was telling her to beg him to kill the cat or he was going to kill her. She could not get herself to do what defendant demanded and "knew" that as a consequence defendant was going to kill her.
At that point, the victim heard the doorbell ring. Defendant took the cat and ran with it presumably toward the front of the house. The victim then went into her bedroom. Defendant came back in the victim's bedroom without the cat. The victim started screaming for help. Defendant put his hands over her mouth and told her that it would be "best [to] shut up." Defendant continued to hold his hands over the victim's mouth until they heard a knock and heard the police crash through the side door. At that point, defendant ran to the kitchen, leaving the victim alone in the bedroom and providing her with an opportunity to get her gun. She got her gun and wanted to kill defendant. The police *357 overcame defendant and took the gun from the victim.

AGGRAVATED RAPE AND AGGRAVATED CRIME AGAINST NATURE
In challenging the sufficiency of the evidence regarding the aggravated rape, defendant argues only that it is unreasonable to accept as true the victim's testimony that he achieved sexual penetration vaginally, because there was no medical evidence of rape or sexual penetration and the victim testified that defendant was unable to maintain an erection. Regarding the aggravated crime against nature conviction, defendant challenges the sufficiency of the evidence to support the conviction generally, without making any specific argument.
Although there was no medical, scientific or physical evidence to establish the requisite element of penetration for aggravated rape, the testimony of the victim established that (despite defendant's inability to maintain an erection) he penetrated her vaginally two times with his penis. The victim's testimony was sufficient to establish this element and the other elements of the offense. See State v. Walder, 504 So.2d 991 (La.App. 1st Cir.), writ denied, 506 So.2d 1223 (La. 1987). Viewing all the evidence in the light most favorable to the state, the evidence clearly supports the jury's verdicts of guilty of aggravated rape and aggravated crime against nature.

AGGRAVATED BURGLARY
In arguing the insufficiency of the evidence of aggravated burglary, defendant contends only that the state failed to prove that there was an unauthorized entry of the residence. Defendant seeks to distinguish the facts present in the instant case from those in State v. Monley, 557 So.2d 319 (La.App. 4th Cir.1990), (a case in which the appellate court found that there was sufficient evidence of aggravated burglary and particularly the requisite element of unauthorized entry by the defendant who was the victim's husband) on the basis that the defendant therein had never lived with the victim at the burgled residence after he and the victim were married. Thus, defendant asserts that because he and the victim had lived at the burgled residence until they physically separated on May 25, about two months prior to the alleged offense, there was no unauthorized entry in this case.
Although defendant correctly states that the evidence established that he and the victim had lived together at the burgled residence until they physically separated on May 25, we find the evidence sufficient to support defendant's aggravated burglary conviction. Herein, the burgled premises were the victim's separate property. She testified that she paid for the residence and was responsible for its upkeep. The victim had never sought a reconciliation with defendant. After their May 25 physical separation, when defendant left the residence, ostensibly surrendered the keys to the residence and stated that he would not return, the victim's next contact with defendant was on June 9. On June 9 and thereafter, every time she spoke with defendant, the victim made it known to defendant that she did not want him to come to her home. On numerous occasions when defendant defied her wishes by coming to her home, the victim contacted the police, making known to defendant that she did not want him on her property. When defendant used a key (which the victim did not know he had) on June 19 to enter her residence and forcibly have sex with her during the early morning hours of May 20, the victim had the locks to her home changed to prevent defendant from entering her home again. Thereafter, when defendant unsuccessfully attempted to reenter her home with the key he had in his possession, the victim initiated proceedings to obtain a temporary restraining order to bar any further entry by defendant to her home, although she did not succeed in obtaining the order before the commission of the instant offenses. Notwithstanding that the defendant in Monley had not lived with his wife after the marriage and that defendant had lived with his wife after their marriage, viewing all the evidence in the light most favorable to the prosecution, any rational trier-of-fact could have concluded that the state proved beyond a reasonable doubt the requisite element of unauthorized entry and *358 the remaining elements of aggravated burglary.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER TWO
By means of this assignment, defendant contends that the trial court erred by denying his motion for new trial. However, defendant's only argument in this assignment consists of the same contentions he made under his assignments of error numbers one, three, and four, each of which is dealt with in this opinion and found to be meritless. Hence, this assignment also lacks merit.

ASSIGNMENTS OF ERROR NUMBERS THREE AND FOUR
By means of assignment of error three, defendant contends that the statute(s) under which his aggravated rape conviction was obtained is (are) unconstitutional. His only basis for that contention is an alleged "conflict of laws" existing between LSA-R.S. 14:43, 43.1 and LSA-C.Cr.P. art. 814 because the list of legislative responsive verdicts in art. 814 A(8) to the charged offense of aggravated rape (an offense from which a spouse is not legally immune) includes as responsive verdicts guilty of simple rape and guilty of sexual battery, offenses from which a spouse is legally immune. Defendant concedes that the legislature has the prerogative to treat one group of offenders (spouses) more harshly than the other group (non-spouses); nonetheless, defendant contradicts that concession by submitting that the result of the alleged "conflict of laws" is to treat a spouse more harshly by giving the trier-of-fact in an aggravated rape prosecution the option of returning verdicts of guilty of simple rape and guilty of sexual battery when the defendant is not the victim's spouse and by denying those verdicts as options in a prosecution, such as the instant prosecution against a spouse. Defendant asserts that in the prosecution against a spouse the trier-of-fact must choose between "a severe grade of the offense [aggravated rape] and complete exoneration." Thus, defendant claims that, when given the choice of exonerating him (returning a not guilty verdict) or sending him to prison for life on the aggravated rape charge (finding him guilty of aggravated rape), the jury chose the latter. Defendant asserts that the alleged conflict between LSA-R.S. 14:43, 43.1 and LSA-C.Cr.P. art. 814 until eliminated by legislative amendment makes it impossible for a prosecution such as the instant one to meet the minimum standards required by due process and that until resolved by amendment the conflict must be resolved in favor of the accused. Finally, in assignment of error number four, defendant contends that pursuant to LSA-C.Cr.P. art. 803, the trial court erred by failing to instruct the jury as to all the responsive verdicts listed in LSA-C.Cr.P. art. 814 A(8).
LSA-R.S. 14:41 A defines rape as "... the act of anal or vaginal sexual intercourse with a male or female person committed without the person's lawful consent."[5]
LSA-R.S. 14:42 A provides, in pertinent part, as follows:
Aggravated rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
LSA-C.Cr.P. art. 814 A(8) provides the following as responsive verdicts to a charge of aggravated rape:
Guilty.
Guilty of attempted aggravated rape.
Guilty of forcible rape.

*359 Guilty of attempted forcible rape.
Guilty of sexual battery.
Guilty of simple rape.
Guilty of attempted simple rape.
Not guilty.
LSA-C.Cr.P. art. 803, in pertinent, provides as follows:
When a count in an indictment sets out an offense which includes other offenses of which the accused could be found guilty under the provisions of Article 814 or 815, the court shall charge the jury as to the law applicable to each offense.
Because the responsive verdicts which may be rendered for an aggravated rape charge are provided for in article 814, that article and not article 815 applies to this charge. See LSA-C.Cr.P. arts. 814, 815. Article 814 C, which must be read together with article 803, provides as follows:
Upon motion of the state or the defendant, or on its own motion, the court shall exclude a responsive verdict listed in Paragraph A if, after all the evidence has been submitted, the evidence, viewed in a light most favorable to the state, is not sufficient reasonably to permit a finding of guilty of the responsive offense.
The failure to give statutorily accurate responsive verdicts is not a spontaneous reversible error. An appellant must show that the inclusion or exclusion of an inappropriate lesser verdict was prejudicial and that fundamental due process has been violated. State v. Reese, 472 So.2d 76 (La.App. 5th Cir.1985); State v. Nolen, 461 So.2d 1073 (La.App. 5th Cir.1984). More particularly, regarding the requirements of due process, the United States Supreme Court stated in Hopper v. Evans, 456 U.S. 605, 611, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982), that:
[D]ue process requires that a lesser included offense instruction be given when the evidence warrants such an instruction. But due process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction. The jury's discretion is thus channelled so that it may convict a defendant of any crime fairly supported by the evidence.
In the instant case, in accordance with LSA-C.Cr.P. arts. 803 and 814 C, the trial court charged the jury that the responsive verdicts to the aggravated rape charge were: guilty, guilty of attempted aggravated rape, guilty of forcible rape, guilty of attempted forcible rape, and not guilty. Accordingly, for reasons more fully stated below, the court correctly excluded guilty of sexual battery, guilty of simple rape, and guilty of attempted simple rape from the list of responsive verdicts applicable to defendant's aggravated rape charge.
Simple rape is defined in LSA-R.S. 14:43 as a rape committed when the anal or vaginal sexual intercourse is deemed to be without the lawful consent of a victim who is not the spouse of the offender[6] because it is committed under one or more of three circumstances detailed in this statute.
Sexual battery is defined in LSA-R.S. 14:43.1 as the intentional engaging in certain acts (set forth in the statute) with another person, who is not the spouse of the offender.[7]
Because the evidence introduced at trial established that defendant was the spouse of the victim at the time of the offense, the trial court correctly excluded guilty of sexual battery, guilty of simple rape and guilty of attempted simple rape from the list of responsive verdicts to the aggravated rape charge. Thus, the exclusion of these verdicts clearly comports with the requirements of constitutional due process. See *360 Hopper v. Evans, 456 U.S. at 611, 102 S.Ct. at 2053. Consequently, defendant's only basis to support his contention of statutory unconstitutionality (i.e., that the alleged conflict concerning the responsive verdicts in article 814 A(8) fails to meet the minimum requirements of due process) fails miserably. If the trial court had erroneously instructed the jury that any of these excluded verdicts were applicable and defendant had been convicted of any of them, this court would have had to reverse that conviction. See State v. Henry, 449 So.2d 486 (La.1984).
Herein, defendant was convicted as charged. Notwithstanding defendant's assertion to the contrary, the jury was not faced with the sole option of convicting defendant as charged or exonerating him by returning a not guilty verdict. The jury had the option of returning any of three lesser guilty verdicts, namely, guilty of attempted aggravated rape, guilty of forcible rape, and guilty of attempted forcible rape. If the jury had felt sympathetic to defendant, for whatever reason, and was inclined to render a lesser verdict, such verdicts were available. State v. Nolen, 461 So.2d at 1079. However, consistent with our findings in reviewing defendant's assignment of error number one, the evidence clearly supported the verdict of guilty as charged rather than any of the available lesser guilty verdicts or a verdict of not guilty. Moreover, even assuming, without conceding, the existence of the conflict which defendant alleges in support of his contention of unconstitutionality, under these facts and circumstances (wherein the jury had the option of finding defendant guilty of three lesser offenses and the evidence clearly supported the verdict of guilty of the charged offense), defendant has shown no prejudice or violation of due process as a result of the exclusion of the verdicts referenced above.
These assignments lack merit.

ASSIGNMENT OF ERROR NUMBER FIVE
By means of this assignment, defendant contends that the trial court erred by denying his motion for mistrial based on a police officer's testimony referring to defendant's arrest for another crime. He argues that the officer's testimony was designed to assist the state in proving an essential element of aggravated burglary, an unauthorized entry of the victim's dwelling, and that, thus, the reference was imputable to the state and mandated a mistrial.
The alleged impermissible reference was made when defense counsel was questioning Officer Kyle Garrison on recross-examination during the following exchange:
Q. Officer, [the victim] called you every time [defendant] stepped on any part of the ground around that house; is that correct?
A. Basically, yes.
Q. And
A. Because he was forbidden to go to the residence or anywhere around the residence.
Q. How was he forbidden? Did he tell you that? Did she tell you that?
A. We forbidden [sic] him to go there.
Q. What authority did you have to forbid him to go to his own house?
A. Because, if I remember correctly, I was involved with a previous arrest of Mr. Williams, dealing with my sergeant, where he discharged a firearm and so forth at the residence, and we arrested him for that. At that point, he was advised then. If I remember correctly, the sergeant did see some restraining order or some type of document or whatever. So that's where he was told not to come back to the residence.
Thereupon, defense counsel moved for a mistrial apparently on the basis of the reference to the previous arrest; the trial court denied the motion.
LSA-C.Cr.P. art. 770 provides in pertinent part as follows:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
....

*361 (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible....
A police officer's unsolicited, unresponsive reference to another crime alleged to have been committed by a defendant is not the comment of a court official under LSA-C.Cr.P. art. 770(2), but such an officer will be held to the same standard if his answers show a pattern of unresponsiveness or improper intent. State v. Harris, 383 So.2d 1 (La.1980); State v. Tate, 506 So.2d 546 (La. App. 1st Cir.), writ denied, 511 So.2d 1152 (La.1987).
The circumstances present in the instant case are clearly distinguishable from those in State v. Lee, 569 So.2d 1038 (La.App. 3rd Cir.1990), the case upon which defendant relies in support of his contention that a mistrial should have been granted. In Lee, testimony elicited by the prosecutor referred to another crime allegedly committed by the defendant; while arguing the defendant's objection to the reference out of the jury's presence, the prosecutor admitted that he had deliberately intended to elicit the testimony. Under those circumstances, the Lee court found that the reference to another crime was inadmissible evidence clearly imputable to the state and that the trial court's failure to grant a mistrial was reversible error. In the instant case, the reference to defendant's alleged arrest for another crime was elicited by defense counsel and not the prosecutor; notwithstanding defendant's assertion to the contrary, there was no indication in the record that the testimony was imputable to the state by a pattern of the witness' unresponsiveness or improper intent.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBERS SEVEN AND EIGHT
In these assignments, defendant contends that his trial counsel rendered ineffective counsel, which claim is predicated on several allegations of deficient performance by trial counsel.
Initially, we note that a claim of ineffective counsel is more properly raised by an application for post-conviction relief in the district court where a full evidentiary hearing may be conducted. State v. Hicks, 554 So.2d 1298 (La.App. 1st Cir.1989), writs denied, 559 So.2d 1374 (La.1990) and 604 So.2d 1297 (La.1992). However, where the record discloses evidence needed to decide the issue of ineffective assistance of counsel and that issue was raised by assignment of error on appeal, the issue may be addressed in the interest of judicial economy. State v. Bourgeois, 451 So.2d 172 (La.App. 1st Cir.), writ denied, 457 So.2d 18 (La.1984).
The United States Supreme Court has established a two-part test for review of a convicted defendant's claim that his counsel's assistance was so defective as to require reversal of a conviction [or death sentence]. In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the court stated:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687, 104 S.Ct. at 2064.
In evaluating the performance of counsel, the "inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 688, 104 S.Ct. at 2065. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.
*362 First, defendant contends that his trial counsel failed to object to improper opening and closing argument by the prosecutor and testimony of two state witnesses (the victim and Emergency Medical Services Employee Tammy Larette) concerning the allegation that he killed the family cat. Defendant argues that the testimony given by the victim and Larette was irrelevant. He contends that, even if this testimony were relevant, it was inadmissible under LSA-C.E. art. 403 and that for these same reasons State Exhibit S-33 (the knife blade used to kill the cat) was also inadmissible. Defendant asserts that, if his trial counsel had objected to the prosecutor's reference in opening and closing argument to the alleged killing of the cat, he would have been entitled to a mandatory mistrial under the provisions of LSA-C.Cr.P. art. 770(2) because the reference was to inadmissible evidence of another crime allegedly committed by defendant. Citing LSA-C.Cr.P. art. 774, defendant also submits that the reference was outside the permissible scope of closing argument.
Notwithstanding defendant's assertions to the contrary, evidence of the killing of the family cat was clearly admissible res gestae evidence, i.e., another crime constituting an integral part of the act or transaction that is the subject of the present proceeding. See LSA-C.E. art. 404B(1); State v. McGuire, 577 So.2d 1120 (La.App. 1st Cir.), writ denied, 581 So.2d 704 (La.1991). In finding this evidence relevant and admissible, we have no difficulty concluding that it was more probative than prejudicial and outweighed any dangers set forth in LSA-C.E. art. 403.[8] Because this evidence of another crime was admissible, defendant would not have been entitled to a mistrial under the provisions of LSA-C.Cr.P. art. 770(2), which proscribes only those references to another crime committed or alleged to have been committed by the defendant as to which evidence is inadmissible.[9] Similarly, because this evidence was admissible, the reference to this evidence by the state during closing argument was not outside the scope of permissible closing argument. See LSA-C.Cr.P. art. 774.[10] Accordingly, the failure to object to the references made in opening and closing argument, the testimony and the exhibit does not support the claimed constitutionally deficient performance of trial counsel.
Second, defendant alleges that trial counsel's performance was deficient because of his failure to object to State Exhibit S-12, a color photograph depicting a door inside the victim's home upon which there is what appears to be a few small bloodstains or smudges. Again, defendant argues that this evidence was inadmissible under the balancing test set forth in LSA-C.E. art. 403. Photographs which illustrate or shed light upon any fact or issue in the case or are relevant to describe the person, place or thing depicted are generally admissible. State v. Burge, 486 So.2d 855 (La.App. 1st Cir.), writ denied, 493 So.2d 1204 (La.1986). Contrary to defendant's assertion, this photograph depicting part of the crime scene was relevant and not unduly prejudicial. Hence, it was admissible; trial counsel's failure to object to it did not constitute deficient performance by him.
Third, defendant submits that trial counsel's failure to object to certain testimony given by the victim concerning the effect the incident had on her seven year old son was *363 irrelevant and constituted ineffective assistance of counsel. The testimony at issue which was elicited by the state on direct examination is as follows:
Q. Your son Steven is seven years old now?
A. Yes.
Q. After this happened, did you get him any kind of counseling?
A. Yes.
Q. How long has he been going to counseling?
A. Since about September of '91.
Q. What kind of signs did he exhibit? What was one of the reason [sic] you sent him to counseling?
A. He was having very restless nights, troubled with real violent nightmares. He would wake up screaming in his sleep, wake all of us up screaming in his sleep.
Q. Did he haveDid he do anything after that July 22nd night with knives?
A. Yes. When I was cleaning his room, I would find that he had some of my kitchen butcher knives and pearing [sic] knives hid in his roomhid, you know, for himfor like his use only. I would find them underneath like hislike in his cubby where his toys were. I move everything when I vacuum so Iyou know, he can't hide anything. I would find them in the kitchen underneath the eves of the counter, the cabinet overhang. He would have them in the corners justI mean, I found so many, it began to worry me.
Q. So you sent him to counseling?
A. Right.
Q. He is still in counseling?
A. Yes.
Even assuming arguendo that this testimony was irrelevant and, thus, inadmissible, trial counsel's failure to object to the testimony was harmless. Defendant's guilt was overwhelmingly established by the state and any prejudice inuring by virtue of the admission of the quoted testimony was minimal. Consequently, defendant has not substantiated his claim of ineffective counsel.
Fourth, defendant claims that trial counsel's failure to introduce into evidence the temporary restraining order obtained on behalf of the victim, which was served upon him after his arrest for the instant offenses constituted ineffective assistance of counsel. The record supports defendant's contention that trial counsel did not introduce or attempt to introduce the order. However, on recross-examination of the victim, trial counsel elicited her testimony that the order was not served on defendant prior to the instant offense but instead after he was incarcerated for these offenses. In light of this testimony given by the victim, it is inconceivable what benefit would have resulted from the introduction of the order itself. Hence, defendant has not substantiated his claim of constitutionally deficient performance of trial counsel.
Finally, defendant asserts that trial counsel rendered ineffective assistance of counsel by failing to publish Defense Exhibit D-1 (a letter and a series of photographs) to the jury; but he does not allege any specific prejudice resulting from this alleged failure of trial counsel. Moreover, the record does not reflect whether or not the alleged failure to publish actually occurred. In view of the lack of an allegation of specific prejudice and because support for this allegation is not evident in the record, we do not find the assertion meritorious. See State v. Brooks, 505 So.2d 714 (La.), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
These assignments lack merit.
For the foregoing reasons, the conviction of defendant is affirmed.
AFFIRMED.
NOTES
[1] The defendant is also referred to as "Willie I. Williams, Jr." and "Willie Williams, Jr." in portions of the record.
[2] Although the trial court erred by not denying the benefit of parole on the aggravated rape conviction as required by LSA-R.S. 14:42 C, this court will not correct the sentence as the error is in defendant's favor and the state has not appealed the illegal sentence. See State v. Fraser, 484 So.2d 122 (La.1986).
[3] In a ninth assignment of error, defendant requests this Court to review the record for errors patent. However, as noted in State v. Buttner, 411 So.2d 35 (La.1982), even if a defendant does not assert the existence of an error patent and discoverable upon the mere inspection of the pleadings and minutes, such error would be noted ex proprio motu. In any event, defendant does not assert the existence of any specific error; our inspection of the instant appellate record fails to reveal any errors patent.
[4] The record reflects that the victim obtained a divorce from defendant on February 12, 1992, on grounds of having lived separate and apart from defendant for six months.
[5] Prior to amendment by 1990 La.Acts, No. 722, § 1, rape was defined in LSA-R.S. 14:41 A as "... the act of anal or vaginal sexual intercourse with a male or female person who is not the spouse of the offender, committed without the person's lawful consent." [Emphasis ours].
[6] Notwithstanding any assertion in brief by defendant to the contrary, 1990 La.Acts, No. 722, added the underscored language to LSA-R.S. 14:43 to accomplish the object of the Act as stated in its title, i.e., "... to provide that rape, except the crime of simple rape, may be committed by the spouse of the victim; to provide for the crime of simple rape committed by anyone who is not the spouse of the victim...."
[7] We note that the underscored language appears in LSA-R.S. 14:43.1 prior to its amendment by 1991 La.Acts, No. 654 § 1 (the version of the statute in effect at the time of the commission of the instant offense) and in the version in effect after the amendment.
[8] LSA-C.E. art. 403 provides as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
[9] LSA-C.Cr.P. art. 770(2) provides as follows:

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
....
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible....
[10] LSA-C.Cr.P. art. 774 provides, in pertinent part, as follows:

The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.