785 So.2d 898 (2001)
STATE of Louisiana
v.
Ronald W. COJOE.
No. 2000-KA-1856.
Court of Appeal of Louisiana, Fourth Circuit.
March 21, 2001.
*899 Harry F. Connick, District Attorney, Juliet Clark, Assistant District Attorney, New Orleans, LA, for plaintiff/appellee.
Sherry Watters, Louisiana Appellate Project, New Orleans, LA, for defendant/appellant.
Court composed of Chief Judge BYRNES, and WALTZER and KIRBY, JJ.
BYRNES, Chief Judge.

STATEMENT OF CASE
On October 6, 1999, the appellant was charged with one count each of unauthorized entry of an inhabited dwelling and unauthorized use of a motor vehicle.[1] At his arraignment on October 26th he pled not guilty to both counts. On November 29th, a six-person jury found him guilty as charged on both counts. On December 10, 1999, the court sentenced the defendant on both counts to serve two years at hard labor, the sentences to run concurrently. On that same date, the court granted the appeal, denied the appellant's motion for reconsideration, and set the multiple bill hearing for January 5, 2000. The matter was reset a few times, and on February 4, 2000, the court found the defendant to be a multiple offender. The court vacated the original sentence and imposed a sentence of three years at hard labor without benefits of parole, probation, or suspension of sentence. The appeal record was lodged in this court on August 29th. The appellant filed his brief on September 11th, and the State responded on December 20, 2000.

FACTS
On July 15, 1999, Helen Cojoe returned to her home to discover her husband's Lincoln had been taken from her back yard. Ms. Cojoe testified that the car had been parked behind a fence before she left to visit her husband Alvin in the hospital that morning. When she returned from the hospital, she noticed the yard was empty and the lock had been broken off of the gate to the yard. Ms. Cojoe testified she called the police to report the theft. Soon thereafter, her granddaughter, Tanya Encalarde, called to tell her that the car was parked at Tanya's mother's house on Desire Street. Ms. Cojoe notified the police and asked that an officer meet her at the Desire Street house. She testified that when she arrived at the house, she asked Tanya's husband to disconnect the car's battery to insure the car could not be moved. Tanya then told her that the defendant Ronald Cojoe, Ms. Cojoe's son, was asleep inside the house. At that point, police officers arrived, entered the house, and arrested the defendant. Ms. Cojoe testified the officers then gave her keys to the car, as well as a ring of keys to her husband's trucks, which they had seized from the defendant.
Ms. Cojoe testified that her husband Alvin had been in the hospital for a few weeks at the time the defendant took the car, and Alvin had been in no condition to give the defendant permission to take the car because he had a tube down his throat and could not talk. She testified the car was Alvin's separate property. She also testified she did not give the defendant permission to take the car. On cross-examination, *900 she admitted the defendant would chauffeur Alvin places and that the defendant had keys to all of Alvin's cars and trucks. She also admitted the defendant had keys to the house she shared with Alvin. She stated her husband was still in the hospital at the time of trial.
Tanya Cojoe Encalarde testified that she is the defendant's daughter. She stated that the defendant and her mother Janice had divorced two years prior to the incidents in this case, and even though the defendant lived with Janice off and on after the divorce, he was not living with Janice in July, 1999. She did not know, however, where he was living because she had not heard from him for approximately two and a half weeks. Tanya testified her mother was in Texas. Tanya stated that before Janice left town, she asked Tanya to check with the alarm company because Janice had changed the locks on the doors and had left the keys with a cousin. Tanya testified that Janice told her she had changed the locks on the door to keep the defendant out of the house while she was away.
Tanya testified that on July 15th, she drove by her mother's house and saw her grandfather's car parked outside. She went to the front door and noticed a pane had been broken in the door. She notified the police. Then she and her husband went inside the house and found the defendant asleep in her mother's bedroom. She testified she called her grandmother and told her the car was parked at Janice's house. Tanya testified that when the defendant awoke, he told her he broke the glass in the door to get inside the house. She testified that when she told him he should have asked her to let him inside the house, he replied that he did not care if Janice would argue about his being there because he was tired of listening to her.
Tanya testified that she met with her grandmother outside the house. Tanya's husband was asked by her grandmother to disconnect the car's battery to keep it from being moved. At that point, the police arrived. She led the officers inside the house, where they arrested the defendant. Tanya stated that the defendant had some of his possessions in the house, but they were kept in the basement.
Janice Cojoe testified that she and the defendant had been married for many years, but they had divorced approximately two years prior to July, 1999. She testified the community property settlement gave her the right to live in the house, and she pays the mortgage on the house. She stated that the defendant lived with her off and on after the divorce, but she had put him out of the house in mid-June, 1999, and he was not living there on July 15th. She testified she had changed the locks on the door to keep him out of the house. She testified she spoke with the defendant a few days before leaving town and told him she was going to be out of town. She testified he did not ask her permission to go into the house while she was away, and she did not give him permission to enter the house in her absence. She testified the glass in the door was intact when she left town on July 14th. She testified she had some sort of restraining order placed on him prior to this incident. She admitted some of the defendant's clothing and furniture remained in the house.
The officer who responded to the residence burglary call at Janice's house testified there were no men's clothing in the bedroom where he found the defendant. He testified the defendant was asleep when he arrived, and the officer awoke him and arrested him. He stated the defendant made no statements at his arrest. However, the officer who was investigating *901 the car theft testified that after he arrived at the house, the defendant admitted he did not have permission to be inside the house.
Ronald Cojoe denied entering his exwife's house without permission, and he also denied taking his father's car without permission. He insisted that although he and his wife were divorced, they lived together off and on after the divorce. He stated that although his ex-wife had put him out of the house a few weeks prior to his arrest, he did not know she had permanently banned him from the house. He denied that she had gotten a restraining order against him. He maintained the mortgage to the house was in his name, along with a second mortgage which he and his sister had gotten on the house, but he admitted his ex-wife had received the house in the community property settlement. He stated he still had clothes, furniture, and a computer at her house.
Cojoe testified he had keys to all of his father's vehicles because he chauffeured his father. He stated that on the morning of July 15th he went to his parents' house to get a truck to use in a moving job he had gotten. He testified he had driven the truck only a short distance when it broke down. He testified he went back to the house to get the Lincoln to push the truck into a parking spot. He stated he got a neighbor to help him move the truck, but he admitted he did not contact this neighbor to come to court to corroborate his story.
Cojoe stated he then decided he could not complete the moving job, and he decided instead to go to his ex-wife's house to change his clothes and rest prior to visiting his father, who was in the hospital. He drove the Lincoln to her house, and when he arrived he realized his key did not work in the door. He stated he broke a pane in the door, reached inside, unlocked the door, and went inside. He testified his daughter Tanya arrived soon thereafter and told him she would have let him inside the house because it was all right for him to be inside the house. He testified he went to sleep and was later awakened by a police officer.
Cojoe described the whole incident involving his father's car and his wife's house as a family misunderstanding that had gotten out of hand. He testified his father had never told him he could not use the Lincoln, and because he had keys to all of his father's vehicles he never knew he did not have permission to use them. He insisted the car was only parked behind the locked gate because a tenant of his parents had somehow gotten a key to the car.
Cojoe testified that although his ex-wife had put him out of the house a few weeks earlier, they had been planning to reconcile. He stated his ex-wife spoke of the reconciliation just prior to leaving town, and he told her they would discuss the matter when she returned. He also testified that they were planning to remarry. He denied that his ex-wife told him prior to leaving town that she did not want him inside the house. He admitted that although he had his possessions inside the house, at his arrest he gave his parents' address as his residence.

I. Errors Patent
A review of the record for errors patent reveals two problems with the multiple bill sentencing, both of which are addressed in the discussion of assignment of error number two. There are no other errors patent.

II. Assignments of Error.
By his first assignment of error, the appellant contends the State presented insufficient *902 evidence to support either of his convictions. The appellant argues the State failed to show that the use of the car and the entry into the house were unauthorized.
In State v. Ash, 97-2061, pp. 4-5 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 667-68[2], this court set forth the standard of review applicable to a claim that the evidence produced was constitutionally insufficient to support a conviction:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact's determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir.1989). When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proved such that every reasonable hypothesis of innocence is excluded. La.R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
The appellant was convicted in the first count of unauthorized entry of an inhabited dwelling, which is defined by La.R.S. 14:62.3 as "the intentional entry by a person without authorization into any inhabited dwelling or other structure belonging to another and used in whole or in part as a home or place of abode by a person." See State v. Segue, 92-2426 (La. App. 4 Cir. 5/17/94), 637 So.2d 1173.
The appellant argues the evidence was insufficient to support the conviction because he had lived in the house with his ex-wife prior to their divorce and had lived with her off and on in the two years after their divorce. He points to the fact that he still had belongings stored there. He also notes that although his ex-wife had changed the locks on the downstairs doors, she had not done so on the upper doors. He argues that her failure to do so somehow shows she did not want to lock him out completely. He ignores the fact, however, that she locked the deadbolt on that particular door, thus insuring he could not get inside the house. He also argues the fact that his daughter said she would have let him inside if he had asked her to do so shows he was authorized to enter the house. Again, the appellant chooses to ignore the testimony of both his daughter and his ex-wife, both of whom stated that *903 his ex-wife had put him out of the house a few weeks before he entered and that his ex-wife did not want him to enter the house while she was out of town.
Similar claims have been rejected by appellate courts in this state with respect to burglary charges, which also include the element of unauthorized entry. In State v. Woods, 526 So.2d 443 (La.App. 4 Cir.1988), the defendant and the victim were still married, but estranged. The victim had moved to another apartment, which was listed in her name and that of a different man. The defendant broke into the apartment. In defense of his simple burglary conviction, the defendant argued that because he and the victim were still married, she was using community funds to pay the rent, thus making the apartment a "community dwelling" over which he had a proprietary interest. This court rejected this argument, finding that because the apartment was not in the defendant's name, and the defendant did not contribute to the rent, it was not a community dwelling, and he did not have a proprietary interest which would have allowed him authority to enter the apartment.
Likewise, in State v. Monley, 557 So.2d 319 (La.App. 4 Cir.1990), the defendant and the victim had lived together prior to marriage, but the defendant had moved out of the residence, leaving the victim the keys. The defendant and the victim subsequently married, but they never lived together after marriage. The defendant had visited the victim and her children at the victim's residence, but she had specifically warned him not to visit in the early morning or late at night. One morning, when the victim refused to allow the defendant to enter the residence, the defendant broke in and raped the victim. On appeal, the defendant argued his aggravated burglary conviction was invalid because his entry was not unauthorized due to his continued marriage to the victim and his numerous visits to the residence. This court disagreed, noting that the defendant had no keys to the residence, had never lived there, and had never contributed to the rent. In addition, this court noted the victim had told him not to visit at the time of the break-in.
In State v. Williams, 632 So.2d 351, 93-0353 (La.App. 1 Cir. 12/29/93), 632 So.2d 351[3], the victim had owned the residence prior to marriage, and it was her separate property. The defendant and the victim had lived in the residence after marrying, but the defendant subsequently left and surrendered his keys, stating his intention never to return. The victim concurred in the wish that he never return to the residence. Over a period of time, however, the defendant continued to return and try to get into the house to harass the victim, and each time she called the police. In each instance, however, the defendant would leave before the police arrived. Three days prior to the crime charged, the defendant entered the house with a key he had retained and raped the victim. She changed the locks on the door, and when he came back and tried to reenter the house using the key, she again called the police. On the day of the incident, the victim completed paperwork for a restraining order against the defendant, and when he learned of this, he returned to the house twice, the second time breaking into the house. While inside, he beat, raped, and sexually assaulted the victim. Neighbors called the police, who caught the defendant inside the residence. On appeal of his aggravated burglary conviction, the defendant argued his entry was not unauthorized because he had lived in the residence with the victim prior to the crime. The *904 court rejected this argument, noting the house was the victim's separate property prior to the marriage, and the defendant had moved from the residence, announcing his intent not to return. The court found compelling the evidence that the victim never reconciled with the defendant; the victim had called the police every time the defendant returned; the victim had changed the locks after he used his key to enter; and the victim had started the process of getting a restraining order against him. These factors convinced the court that the defendant's entry into the house was unauthorized.
The cases cited by the appellant do not support his contention that the State failed to show he did not have authorization to enter the victims' home. In State v. McKnight, 539 So.2d 952 (La.App. 4 Cir. 1989)[4], the defendant broke into her ex-husband's residence. In McKnight the defendant did not contend that she had authorization to enter the victim's home based on her relationship to her ex-husband. Instead, she contended that the atrium area through which she entered was to be considered a part of the residence. She also argued that her ex-husband opened the door and admitted her. The appellate court found the evidence sufficient to justify the rejection both contentions, and neither contention has any bearing on the arguments made by the defendant in the instant case.
In State v. Peterson, 92-1058, (La. App. 4 Cir. 8/31/93), 623 So.2d 919, the defendant contended he could not have been convicted of simple burglary of his grandmother's house because he was a one-eighth owner of the house because of his grandfather's death. He also argued he had authorization to be in the house because he had previously lived in the house before being asked to move. This Court, while noting that civil law concepts could be used to determine if a person had a right to enter a residence, rejected the defendant's claim. The court noted that because his grandmother had a usufruct on the property as the surviving spouse, he could take no action which impinged upon her usufructuary rights.
Likewise, in State v. Johnson, 29,269 (La.App. 2 Cir. 4/2/97), 691 So.2d 370, the defendant entered his mother's house while she was away. He insisted his nephew let him inside the house, but the nephew maintained he did not do so. The victim testified she had told the defendant many times he could not enter the house. The appellate court upheld his conviction, finding his entry was unauthorized.
In State v. Spain, 99-1956 (La.App. 4 Cir. 3/15/00), 757 So.2d 879, the defendant entered his ex-girlfriend's kitchen, attacked her and also her new boyfriend's motorcycle with a hammer, and then went into another part of the house, swinging at the new boyfriend and breaking a large aquarium. The residence belonged to the victim and her new boyfriend, but the defendant's daughter lived with the victim, and the defendant sometimes visited the residence to see her. The victim testified she probably would not have called the police at the defendant's entry if he had not committed the acts of violence. This court rejected the defendant's claim that his prior acceptance into the house showed his entry was not unauthorized. This court stated: "The relevant question is not whether defendant could generally enter the victim's residence, but whether this particular entry was authorized." Id. at p. 8, 757 So.2d at 884.
Here, as in Spain, the appellant had previously been allowed inside the house. *905 However, both the appellant's ex-wife and his daughter testified the victim had put him out of the house a few weeks prior to the entry, and both testified the victim had changed the locks on the door to keep him out while the victim was out of town. Even discounting one officer's testimony that the appellant admitted he did not have permission to be inside the house (the officer who actually arrested him stated the appellant made no statements), the evidence presented by the State proved beyond a reasonable doubt that the appellant did not have authority to enter the house. There was sufficient evidence to support his conviction for unauthorized entry of an inhabited dwelling.
The appellant was also convicted of the unauthorized use of his father's car. La.R.S. 14:68.4 defines this offense as: "the intentional taking or use of a motor vehicle which belongs to another, either without the other's consent, or by means of fraudulent conduct, practices, or representations, but without any intention to deprive the other of the motor vehicle permanently."[5] The appellant argues the State failed to show that his use of his father's Lincoln was unauthorized. He argues, and his mother at trial conceded, that he had keys to all of his father's vehicles and that he often chauffeured his father in the Lincoln as well as in other vehicles. In addition, it appears the appellant's father, the actual owner of the Lincoln, was physically unable to either give express permission for this particular use of his car or to revoke his prior permission to use the car because he was in the hospital with a tube in his throat and thus was unable to speak.
The State notes that at the time the appellant took the Lincoln, it was parked in his parents' yard behind a locked fence, and he had to break the lock in order to take the car. The State argues the placement of the car behind the locked gate showed an intent to keep the appellant from using the car. However, there was no evidence as to who placed the car behind the fence, whether it was done by the owner or by someone else with his express purpose of keeping the appellant from having access to the car, or whether the appellant's mother, the owner's wife, placed the car there. By her own admission, the appellant's mother did not own the car and could not give (or apparently deny) authority to use the car. The defendant had keys to the car and apparently had use of the car prior to his father's hospitalization. Ms. Helen Cojoe confirmed this. There is nothing to suggest that the defendant's possession of the keys was unauthorized. There is no evidence that defendant's father's implied consent to use the vehicles did not accompany the delivery of the keys to the defendant. The delivery of keys to a vehicle by a father to a son implies as much. The State had the burden of proving that on July 15, 1999, the appellant did not have authority to use the Lincoln. Given the appellant's possession of the keys to this car as well as his father's other vehicles and his prior authority to use them, we find that the State failed to meet its burden. Therefore, we must reverse the defendant's conviction for unauthorized use of a vehicle.

III. SECOND ASSIGNMENT OF ERROR
By his second assignment, the appellant contends the trial court erred by *906 sentencing him as a multiple offender on both counts. He argues that because these two counts arose out of the same transaction, he could be sentenced as a multiple offender on only one count. As we have overturned defendant's conviction for unauthorized use of a vehicle, this assignment of error becomes moot. However, there is no error in the single multiple sentence of three years which is proper in connection with the conviction for unauthorized entry.
On the other hand, as asserted by the appellant and acknowledged by the State, the trial court erred by ordering that the sentence be served without benefit of parole. Neither La.R.S. 14:62.3 nor La.R.S. 14:68.4 prohibit parole eligibility, and while La.R.S. 15:529.1 prohibits the eligibility for probation or suspension of sentence, it does not prohibit parole eligibility. Thus, the sentence is illegal. Accordingly, we hereby amend the single multiple bill sentence to delete the prohibition against parole and affirm the sentence as amended.
Therefore, the conviction for unauthorized entry of an inhabited dwelling is affirmed. The conviction for unauthorized use of a vehicle is reversed. The multiple bill sentence is amended to delete the prohibition against parole, and the sentence as amended is affirmed.
CONVICTION FOR UNAUTHORIZED ENTRY AFFIRMED; CONVICTION FOR UNAUTHORIZED USE OF A VEHICLE REVERSED; MULTIPLE BILL SENTENCE AMENDED.
NOTES
[1] These charges were originally filed in case # 408-856 on August 6, 1999. This earlier case was nolle prosequied on October 6, 1999, when the trial court denied the State's motion for continuance. The charges were reinstituted in the instant case later that day.
[2] Writ denied, 99-0721 (La.7/2/99), 747 So.2d 15.
[3] Writ den. 94-1009 (La.9/2/94), 643 So.2d 139.
[4] Writ den. 548 So.2d 322 (La.1989).
[5] The only cases we found discussing the lack of authority to use a car are not really pertinent to this case as they each dealt with situations where the defendant took a car for sale for a supposed test drive and then never returned the car to the lot. See State v. Spencer, 97-811 (La.App. 5 Cir. 1/27/98), 707 So.2d 119; State v. Carmon, 539 So.2d 752 (La.App. 3 Cir.1989).